## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Doe,

        Plaintiff,

   v.

St. Olaf College,

        Defendant.

> **Jury Trial Demand**
>
> **VERIFIED COMPLAINT**
>
> **Case No.:**

Plaintiff John Doe[1] ("Plaintiff") as and for his Complaint against St. Olaf College ("St. Olaf") respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1. John Doe seeks damages and injunctive relief from the unlawful actions taken and procedures employed by Defendant and its agents that resulted in the wrongful suspension of Plaintiff, then a freshman. The suspension was the result of a rigged and unfair disciplinary process put in place to rush to a pre-determined result, with deliberate disregard for the consequences to Plaintiff, in violation of both state and federal law.

### THE PARTIES

2. Plaintiff John Doe is a student of South Asian origin, who resides in Illinois. John Doe was a full-time student at St. Olaf in Fall 2017.

---

[1] Plaintiff has filed a Motion to proceed pseudonymously.

1

3. Defendant St. Olaf College is a private, Lutheran liberal arts college and a domestic non-profit corporation incorporated in Minnesota, with its principal place of business located at 1520 St. Olaf Avenue, Northfield, MN 55057.

## JURISDICTION AND VENUE

4. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5. Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6. This Court has personal jurisdiction over Defendant on the grounds that it is conducting business within the State of Minnesota.

7. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

**A.    St. Olaf College**

8. Defendant is a private Lutheran university with a student population of approximately 3,040 students.

9. During the 2017-2018 academic year, the United States Department of Education ("DOE") distributed billions of dollars to public and private colleges and universities for students attending their schools. Upon information and belief, St. Olaf was a recipient of such federal funding.

**B.      Growing National and Federal Pressure to Hold Male Students Responsible for Sexually Assaulting Female Students**

10. This case arises amidst a growing national controversy stemming from the Department of Education's Office of Civil Rights ("OCR") threats to withhold federal education dollars in order to compel colleges and universities to address so-called "sexual violence" on campuses.

11. OCR's threatened withholding of federal funds puts great pressure on Defendant and other universities to treat male students accused of sexual misconduct with a presumption of guilt and to simply punish the male student in order to avoid jeopardizing the flow of taxpayer dollars, under the guise of making campuses safe for female students.

12. As detailed below, for years, Defendant and other universities were under federal scrutiny from the DOE for alleged indifference to sexual violence on campus in violation of Title IX, and for violations of the Clery Act, which requires colleges to keep and disclose information about crime on and near their respective campuses. Title IX compliance is monitored in part by the DOE which can impose civil penalties and can suspend institutions from participating in federal student aid programs.

13. Upon information and belief, Defendant's violations of Plaintiff's rights occurred in part because of threats by the federal government that universities could lose federal funding or

face other adverse consequences for not finding male students like Plaintiff responsible for sexually assaulting female students. Evidence of this pressure includes but is not limited to, the White House's April 2014 report entitled "Not Alone", which encouraged schools to combat sexual assault of women on campuses and warnings that if colleges do not adhere to Title IX they "risk[] losing federal funds" and/or face potential lawsuits filed by the Department of Justice."[2]

14. In 2015, in a highly publicized case, Defendant found the alleged perpetrator of a sexual assault of Madeline Wilson not responsible for such assault.  Ms. Wilson objected and she did so in a public setting, drawing the attention of local media, including and not limited airing of her grievances on statewide television and articles in the Minneapolis Star Tribune newspaper.  As a result of negative publicity, Defendant is overcompensating now, in order to avoid bad publicity. http://www.startribune.com/st-olaf-student-protests-sexual-misconduct-policy-with-a-t-shirt/374837711/

https://mycollegeisprotectingrapists.wordpress.com/about/

15. It was under these pressures and this climate that the allegations against Plaintiff were investigated and adjudicated, with Defendant using a process akin to a "kangaroo court" that chose to presume his guilt before an investigation was even started, violating Plaintiff's due process rights, depriving him of the basic tenets of fairness and justice and penalizing him severely and egregiously, without adequate evidence or cause.

---

[2] See https://www.notalone.gov/assets/report.pdf.

C.      **Federal Statutory and Regulatory Requirements Concerning Allegations of Sexual Assault.**

16. The issue of sexual assaults on college and university campuses is primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.[3] A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance."[4] In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

17. Defendant, as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

18. Since regulations were first promulgated under Title IX in 1972[5], there has been a requirement that a school "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.[6] Both the Department of Education and the Department of Justice have set forth this requirement by way of regulation.[7] It has also long

---

[3] 20 U.S.C. §§ 1681(a), 1687.
[4] 34 C.F.R. § 106.4(a)-(c).
[5] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001)) ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.
[6] 34 C.F.R. § 106.8(b)
[7] 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX."[8] "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual intercourse, sexual assault, and rape. Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.[9]

19. The Office for Civil Rights ("OCR") of the Department of Education investigates and administratively enforces Title IX as it relates to sexual harassment. In 2001, OCR promulgated regulations pursuant to notice-and-comment rulemaking[10] in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").[11] OCR issued these regulations to "continue[ ] to provide the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."[12]

20. Title IX's regulations, including the 2001 Guidance, have the force and effect of law, for they affect individual rights and obligations, and were the product of notice-and-comment rulemaking.

21. In the 2001 Guidance, OCR recognized that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past

---

[8] 2001 Guidance at 2 & n.3.
[9] *Id.* at 2-3 & nn.2, 3, 6, 8, 20.
[10] *Id.* at ii.
[11] *See* note 3 *supra.*
[12] 2001 Guidance at i.

experience."[13] Nevertheless, OCR has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirement of the regulations.

22. First, in a section entitled "Due Process Rights of the Accused," OCR states that the procedures must not only "ensure the Title IX rights of the complainant," but must do so while "according due process to both parties involved."[14] This Title IX "due process" requirement applies to both state and private colleges and universities.[15]

23. The "prompt and equitable" procedures that a school is required to implement to "accord due process to both parties involved" must include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed"; "Application of the procedure to complaints alleging [sexual] harassment . . ."; "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and "Notice to the parties of the outcome of the complaint . . . ."[16]

24. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."[17]

---

[13] 2001 Guidance at 20.
[14] Id. at 22.
[15] Id. at 2, 22.
[16] Id. at 20.
[17] Id. at 21.

25. In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."[18] The Letter reaffirmed the vitality of the 2001 Guidance while putting pressure on schools to find male students accused of sexual assault responsible. As set forth in the Letter, OCR states that compliance with Title IX requires the following:

   a. A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."[19]

   b. "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."[20]

   c. The complainant and the accused student "must have an equal opportunity to present relevant witnesses and other evidence."[21]

   d. The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing. For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the [accused student]."[22]

---

[18] "Dear Colleague" Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf.
[19] *Id.* at 8.
[20] *Id.* at 10 (emphasis added) (footnote omitted).
[21] *Id.* at 8.
[22] *Id.* (emphasis added).

e. "Schools must maintain documentation of all proceedings, which may include written findings of fact, transcripts, or audio recordings."[23]

f. "[S]chools [should] provide an appeals process."[24]

g. "In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence."[25]

h. "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner."[26]

**D.    2011 Dear Colleague Letter and April 29, 2014 guidance question and answers rescinded, basis fairness to both accuser and accused required**.

26. In September 2017, in response to concerns that prior guidelines had created a system that had gone too far and was treating the accused unfairly, the OCR issued a "significant guidance document" entitled "Q&A on Campus Sexual Misconduct." That Q&A rescinded the Dear Colleague letter and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014, noting that the withdrawn documents "ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness.[27]"

27. The 2017 Q&A, while reaffirming the vitality of the 2001 and 2006 Guidance Documents, made notable changes from the guidance provided in the Dear Colleague Letter and the 2014 Q&A Guidance, including:

---

[23] *Id.* at 12 (emphasis added).
[24] *Id.*
[25] *Id.* (emphasis added).
[26] *Id.* (emphasis added).
[27] https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

a. Removing the requirement that findings of fact and conclusions must be reached by applying a preponderance of the evidence standard and allowing institutions to decide whether to apply the more likely than not preponderance standard or the highly probable clear and convincing evidence standard[28];

b. Making it clear that the burden is on the institution, and not on either party, to gather sufficient evidence to reach a fair and impartial determination as to whether sexual misconduct has occurred[29]; and

c. Removing the 60 day deadline for adjudication of claims in favor of a prompt resolution of claims that afforded both parties fairness.

### E.   Defendant's Policy Prohibiting Discrimination, Harassment and Related Misconduct.

28. Defendants "Policy Prohibiting Discrimination, Harassment and Related Misconduct" (hereinafter "Policy") sets forth the school's policies and procedures for investigating and adjudicating allegations of sexual misconduct. See Exhibit 1 – Policy Prohibiting Discrimination, Harassment and Related Misconduct.

29. Defendants represented in the Policy that its policies and procedures concerning sexual assault complied with the requirements of Title IX.

30. In the Policy effective September 1, 2017 "Consent" is defined as:

> Consent is words or overt actions by a person clearly and affirmatively communicating a freely-given, present agreement to engage in a particular form of *sexual contact*. Words or overt actions clearly communicate consent when a reasonable person in the circumstances would believe those words or

---

[28] Id. at Question 8
[29] Id. at question 6

actions indicate a willingness to participate in the mutually agreed-upon *sexual contact*.

All parties to a particular form of *sexual contact* must provide consent, and such consent must be present throughout the activity.  It is the responsibility of the individual who is initiating each *sexual contact* to obtain consent before proceeding to engage in the *sexual contact*.
Even when consent is given, it may be retracted at any time. When consent is withdrawn, the *sexual contact* for which consent was initially provided must stop immediately.  Any words or overt actions can communicate withdrawal of consent.  As is the case with communicating the existence of consent, verbal communication is usually the clearest way of communicating withdrawal of consent.

A person can only provide consent when that person:

- Acts freely and voluntarily, without *coercion or force* or otherwise feeling unduly pressured, threatened, intimidated;
- Is informed about the nature of the *sexual contact* involved;
- Is not *incapacitated*, whether from alcohol, other drugs, or other causes, such that they cannot understand the fact, nature, or extent of the *sexual contact*;
- Is conscious;
- Is of legal age to consent (16 years old in Minnesota with some exceptions for younger individuals who are close in age).

These requirements for consent mean that *sexual contact* with someone who is threatened, coerced, intimidated, uninformed, incapacitated, asleep or otherwise unconscious, or not of legal age, is by definition sexual assault.

In addition, consent to a particular *sexual contact* cannot be inferred from:

- Consent to a different form of *sexual contact*;
- An existing or prior dating, sexual, romantic or marital relationship;
- Silence that is not otherwise accompanied by overt actions indicating consent;
- An absence of physical resistance or verbal protest; or
- Prior sexual activity with other individuals.

31. In the Policy effective September 1, 2017, "Sexual contact" is defined as:

Sexual contact is defined under Minnesota law as the intentional touching by an individual of another's intimate parts (including an individual's breasts, inner thighs, buttocks, genitals and/or groin area, whether clothed or unclothed); or the coerced touching by an individual of another's intimate parts. Sexual contact also includes the intentional removal or attempted removal of clothing covering an individual's intimate parts.

32. In the Policy effective September 1, 2017, "Sexual assault" is defined as:

Sexual assault is a form of *sexual harassment* and *sexual violence*. Sexual assault is any *sexual contact* with another person who does not or cannot give *consent*. This may or may not include force. Sexual assault includes, but is not limited to:
• Rape (the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of any person, without the *consent* of the victim);
• Fondling (the touching of the private body parts of another person for the purpose of sexual gratification, without the *consent* of the victim);
• Incest (sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law);
• Statutory rape (sexual penetration or other form of *sexual contact* with a person who is under the statutory age of *consent*).

33. According to the Policy effective September 1, 2017, any employee of Defendant who is not a "confidential resource" has an obligation to immediately share all known details about any incident of Prohibited Conduct with the Title IX Case Manager, the Title IX Coordinator, or other member of the Title IX team.

34. Once the Title IX Case Manager is made aware of the complaint, the following steps related to the complaining party are mandated:

The *Title IX Case Manager* will confer with the reporting party in order to:

• Assess the reporting party's safety and well-being and identify available support and assistance;
• Inform the reporting party of the right to seek medical treatment and explain the importance of obtaining and preserving forensic and other evidence;
• Inform the reporting party of the right to contact law enforcement,

decline to contact law enforcement, and/or seek a protective order;
- Inform the reporting party about resources available at the College and in the community, the right to seek appropriate and available remedial and protective measures, and how to request those resources and measures;
- Inform the reporting party of the right to seek *Informal Resolution* (when available) or to initiate an investigation under the *Formal Resolution Process*, seek to obtain the reporting party's consent to initiate the *Formal Resolution Process*, and discuss with the reporting party any concerns or barriers to participating in a *Resolution Process*;
- Explain the College's prohibition against *retaliation* and that the College will take prompt action in response to any act of *retaliation*.

35. After the Title IX Case Manager is made aware of a complaint of prohibited conduct, the

Title IX Case Manager must decide whether Interim protective measures are necessary,

which can include, but are not limited to:

- Access to counseling or medical services and assistance in setting up initial appointments on and off campus.
- A College-imposed "no-contact order" prohibiting contact between individuals.
- Assistance in petitioning a court for an *order for protection / harassment restraining order*.
- Prohibiting an individual from being on campus or at college events.
- Providing security escorts to assure safe movement between classes and activities.
- Rescheduling of exams or assignments.
- Providing alternative course completion options.
- Providing other academic support services, such as tutoring.
- Changing a student's class schedule.
- Changing an employee's work schedule or job assignment.
- Changing campus housing arrangements and assistance with housing relocation.
- Limiting access to certain College residence halls, facilities or activities pending resolution of the matter.
- Voluntary leave of absence.
- College-imposed leave, suspension or separation for individuals accused of committing *Prohibited Conduct* where there is a credible threat of serious disruption to the College's operations or a danger to the St. Olaf community.
- Making information available about and providing assistance with respect to orders for protection and *harassment restraining orders*, including enforcement of such orders.

● In cases where the individual is or becomes enrolled at a different educational institution either because of a transfer, on-going studies after graduation from St. Olaf, or temporary enrollment at a different institution, the College will provide information about resources available at the student's current institution.
● Any other measure deemed appropriate for fostering a more comfortable and safe educational and living environment.

36. The Title IX Case Manager must then also determine whether the complaint shall proceed through the school's "Informal Resolution Process" or the "Formal Resolution Process."

37. The "Informal Resolution Process" "involves the voluntary crafting of an agreement between the Reporting Party and the Responding Party, which the College must also approve, designed to stop, remedy, and prevent *Prohibited Conduct*."

38. The "Formal Resolution Process" "involves the investigation and adjudication of a charge of *Prohibited Conduct*. When an investigation results in a determination that it is more likely than not that a *Responding Party* engaged in *Prohibited Conduct*, the Formal Resolution process also includes the determination of sanctions to be imposed.

39. Whether the matter proceeds through the "Informal Resolution Process" or the "Formal Resolution Process" Defendant purports a "Commitment to fair treatment of all parties," which includes the following:

● Prompt and equitable resolution of allegations of *Prohibited Conduct*;
● Respect of their privacy in accordance with the Policy and any legal requirements;
● Freedom from *retaliation* for making a good faith report of *Prohibited Conduct* or for participating in a Resolution Process;
● The responsibility to refrain from *retaliation* directed against the other party or any other person for making a good faith report of *Prohibited Conduct*, for participating as a witness to a Resolution Process, or for participating in any proceeding under these Resolution Processes;
● The responsibility to provide truthful information in connection with the investigation and adjudication under the Formal Resolution Process;

- The opportunity to articulate concerns or issues about proceedings under these Resolution Processes with the *Title IX Case Manager*;
- Timely notice of any meeting or proceeding relating to the Formal Resolution Process at which the reporting party or responding party will be in attendance, including any meetings with the investigator, the adjudication panel or other College officials;
- The opportunity to select an advisor of choice, including the right to have that advisor attend any meeting or proceeding at which the party's presence is contemplated by these Resolution Processes;
- Written notice of the general nature of the alleged *Prohibited Conduct*;
- The opportunity to challenge the investigator or any member of the adjudication panel for bias or conflict of interest;
- The opportunity to offer information, present evidence, and identify witnesses during an investigation;
- The opportunity to be heard, orally and/or in writing, as to the determination of a violation of this Policy and the imposition of any sanction(s);
- Timely and equal access to any information that will be used during proceedings and related meetings;
- Reasonable time to prepare any response contemplated by these Resolution Processes;
- Written notice of any extension of timeframes for good cause; and
- Written notice of the determination of any proceedings, including the determination of whether Prohibited Conduct is believed to have occurred, and if so, the imposition of any sanction(s), and the rationale for each.

40. A complaint will proceed under the "Formal Resolution Process" under the following

circumstances:

- A reporting party reports *Prohibited Conduct* and requests, at any time, that the College proceed with an investigation and adjudication under this Formal Process;
- Attempts to resolve a reported incident of *Prohibited Conduct* through the Informal Process are unsuccessful and the Reporting Party decides to initiate the Formal Resolution process; or
- In reviewing the nature of the report of *Prohibited Conduct,* the *Title IX CORE Team* determines, based upon a review of the totality of the circumstances and guided by a consideration of the *risk factors*, that investigation of the reported conduct is necessary to protect the health and safety of the reporting party and/or other members of the St. Olaf community

41. The "Formal Resolution Process" starts with an investigation, during which it is claimed that "the parties will have an equal opportunity to be heard, to submit information and corroborating evidence, to identify witnesses who may have relevant information, and to suggest questions that they believe should be directed by the investigator to the other party or any witness."

42. During the investigation, the investigator "will notify and seek to meet separately with the reporting party, the responding party, and third-party witnesses, and will gather other relevant and available evidence and information, including, without limitation, electronic or other records of communications between the parties or witnesses (via voice-mail, text message, email and social media sites), photographs (including those stored on computers and smartphones), and medical records (subject to the consent of the applicable party). Normally, interviews of the parties and witnesses will be audio recorded."

43. The Policy states that the Formal Resolution Process will be completed within 60 days, with extensions available for "good cause", "which may exist if additional time is necessary to ensure the integrity and completeness of the investigation, to comply with a request by external law enforcement for temporary delay to gather evidence for a criminal investigation, to accommodate the availability of witnesses, to account for College breaks or vacations, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons.

44. The investigative portion of the Formal Process is set to be completed within 25 calendar days, with no further opportunity for either party to submit additional evidence, absent "extraordinary circumstances."

45. After the conclusion of the investigation, the Investigator is to prepare an Investigation Report summarizing the information gathered, but not including any findings. Within five (5) days of being made aware this report has been issued, either party can review the report, meet with the investigator, and submit written requests for corrections to errors of fact. The parties can also request additional investigation, which can be conducted at the discretion of the investigator.

46. Within 5 days of receiving any responses to the Investigation Report, the investigation is to issue an Investigator's Decision Letter, which includes findings related to the allegation, made using a preponderance of the evidence standard.

47. After the conclusion of the investigation and factual findings, either party can appeal the Investigator's Decision Letter to the Adjudication Panel, which consists of the Vice President for Student Life and the Dean of Students. Any appeal must be made within three (3) days of being notified the Investigator's Decision Letter is available.

48. If there is a finding of responsibility for sexual assault in the Investigator's Decision Letter and neither party appeals, the matter proceeds to the Adjudication Board for determination of the sanction. If the party found responsible for sexual assault appeals, the Adjudication Board will determine if the factual findings are clearly erroneous and, if upheld, will decide what discipline will be imposed.

49. The clearly erroneous standard as applied means the "investigator's decision will not be changed unless there is evidence that the investigator committed a clear error of judgment in reviewing the facts and reaching a conclusion, such that no reasonable investigator reviewing

the evidence made available during the investigation could have made the same conclusion the investigator reached."

**F.   The Night of November 11 and Morning of November 12, 2017**

50. On Friday, November 11, 2017, and into the early morning of November 12th, Plaintiff was alone in his dorm room watching Netflix and having a drink of vodka.

51. At some point, Plaintiff decided to text his female friend M, to see if she and whoever else she was hanging out with wanted to hang out at his dorm.

52. M texted back and said she would stop by when she got back to the dorm.

53. Around 1 a.m., M, along with three other females arrived at Plaintiff's room.

54. Plaintiff knew M, her roommate E, and the third female from around the dorm, but not Jane Doe.

55. After the women arrived, Plaintiff offered them a drink. The women agreed they wanted a drink and E went up a floor to her and M's room to get shot glasses so they could all take shots.

56. At the time, Plaintiff was on his futon with 3 of the women, with Jane Doe closest to him, and getting closer as time went by.

57. The group was laughing and talking in Plaintiff's room until a next door neighbor started banging on the wall because they were too loud.

58. The group of five then went up a floor to M and E's room. Plaintiff brought a bottle of vodka and a Mountain Dew in his backpack.

59. Plaintiff poured some vodka into his Mountain Dew and the group started to play "truth or dare", during which time they all took approximately 3 shots.

60. During the game, there were a number of "dares" which involved the parties kissing each other, including the females kissing each other, Plaintiff being dared to give E a hickey, and Plaintiff being dared to take a shot out of Jane Doe's belly button.

61. During this time, Plaintiff sat on the floor next to Jane Doe, who had a blanket that she pulled up over them both.

62. At one point, everyone but Plaintiff and Jane Doe left the room and Plaintiff "dared" Jane Doe to kiss him.

63.  Jane Doe kissed Plaintiff with an open mouth and for much longer than any of the other kisses that happened during the game.

64. Sometime between approximately 2:15 and 2:45 a.m., Plaintiff stated that he was returning to his room for the night and invited anyone that wanted to come with him to do so.

65. Jane Doe stood up and stated that she would come with Plaintiff.

66. E and M, whose room they were in, offered to let Jane Doe stay in their room if she wanted because her dorm was far away.

67. Plaintiff also made an offer stating that Jane Doe could sleep on his futon if she wanted.

68. Plaintiff and Jane Doe then went down a floor to Plaintiff's room.

69. Plaintiff then went to Jane Doe and they started to make out on Plaintiff's bed.

70. After making out for a while, Jane Doe excused herself to use the restroom, and then returned to the room, where she sat next to Plaintiff on his bed and they started making out again.

71. As they were making out, Plaintiff and Jane Doe moved to a lying down position and Plaintiff took off Jane Doe' shirt with her assistance, and then Plaintiff's shirt, while still making out.

72. After some time, Plaintiff unhooked Jane Doe's bra, which she then removed by pulling it off over her head.

73. Plaintiff then asked Jane Doe if he could remove her pants.

74. Jane Doe made a noise that sounded like assent and when Plaintiff undid the button and zipper of her jeans, Jane Doe lifted her hips up and moved her hips slightly to help Plaintiff remove the tight jeans.

75. Without Jane Doe's assistance, Plaintiff would not have been able to remove her jeans because of how tight they were.  Jane Doe's underwear came off with her jeans.

76. Jane Doe, then nude, moved closer to Plaintiff, and shifted her legs into a position that allowed Plaintiff to more easily touch her vagina.

77. When Plaintiff touched Jane Doe's vagina, Jane Doe had little response to his touch, so he stopped touching her and moved over her to the outside of the bed.

78. During Plaintiff's movement, Jane Doe spoke again so Plaintiff moved closer to her and started to touch her vagina again while kissing her.

79. While this was occurring, Plaintiff could feel Jane Doe's hand near his crotch and thought she was reaching for his penis, so he pulled his shorts down and moved Jane Doe's hand to his penis.

80. When Jane Doe released his penis, Plaintiff looked at her face again and believed that she had fallen asleep. He then pulled up his pants and fell asleep for some time.

81. In what felt like just moments after Plaintiff laid down, he got up to use the restroom and put on a shirt before going into the hallway. When he got up, he woke Jane Doe to let her know he was going to the bathroom.

82. Jane Doe seemed confused about where she was and asked why she was not wearing clothes.

83. Plaintiff told her she had taken off her clothes and then fell asleep, implying they had stripped together. He then handed Jane Doe her pants and left to go to the bathroom.

84. When Plaintiff returned to his room, Jane Doe was dressed and leaving. She said she never wanted to see Plaintiff again and got into the elevator.

85. Plaintiff then went to sleep.

86. When Plaintiff awoke, he tried to message Jane Doe on Snapchat but learned she had blocked him.

87. Plaintiff then messaged M from the floor above asking if she could give him Jane Doe's phone number. M said she was not comfortable giving Plaintiff the phone number.

88. Around 9 or 10 p.m. that night two (2) females Plaintiff had never seen before knocked on his door. Plaintiff was across the hall, but his roommate came to get him.

89. The girls asked, very forcefully and loudly, if Plaintiff had raped their friend last night.

90. Plaintiff said he had not and explained that he and Jane Doe were in bed and she had fallen asleep after they took their clothes off.

91. On Wednesday November 15, 2017, Plaintiff was interviewed in his dorm room by officers from the Northfield Police Department.

**G.    Jane Doe Makes a Sexual Assault Report**

92. On November 15, 2017, Jane Doe contacted St. Olaf officials to make a complaint of sexual assault. In emails with Kari Hohn, Defendant's Title IX Case Manager, Jane Doe was advised to meet with St. Olaf officials, and encouraged to bring any physical evidence, including her underwear and pants, to that meeting.

93. Later on November 15, 2017, Jane Doe contacted the Northfield Police Department to report that she had been sexually assaulted by Plaintiff.

94. Investigators from the NPD arrived at Tomson Hall at around 2:30 pm that day.

95. There Jane Doe reported the following events had occurred in Plaintiff's dorm room after the others left:

   a.   She and Plaintiff were left alone and Plaintiff started to make out with her, getting on top of her.

   b.   She then got up and went to the bathroom.

   c.   When she returned, Plaintiff was in his bed, playing music. He asked Jane Doe to dance to the music.

   d.   Jane Doe said no, and said she just wanted to go to bed.

   e.   Plaintiff then pulled her on top of him and started making out with her again.

   f.   Plaintiff continued to touch her body in the bed and she told him that she did not want to do that right now and reminded Plaintiff she was tired. Jane Doe mentioned to the police that when she was lying down she felt tired and unresponsive but she told the investigator she was also saying no to Plaintiff.

   g.   Plaintiff then asked Jane Doe if she wanted to take her clothes off. She said no.

h. Plaintiff then said he just wanted to be naked with her and started to take off her clothes. Jane Doe said no, but Plaintiff continued.

i. Plaintiff then took off her shirt and started to make out with her again, touching her breasts over her bra, before taking her bra off, though she did not remember exactly when Plaintiff took her bra off.

j. Plaintiff then put his hands down Jane Doe's pants. He asked her if she wanted to do "things" but she said she was too tired and wanted to go to bed.

k. Plaintiff then started to unbutton her pants, to which she said "no," but Plaintiff did not stop. According to Jane Doe, Plaintiff was already naked by this time.

l. Plaintiff then took Jane Doe's hand and put it on his penis in a way that allowed him to thrust into her hand, despite her not doing anything to hold on.

m. While this was happening, Plaintiff touched her vagina with his hand, and inserted his fingers into her vagina several times. Jane Doe said no to this activity.

n. Plaintiff then put his mouth on Jane Doe's vagina. Jane Doe said no to this activity.

o. Plaintiff then asked if he could have sex with her. Jane Doe said no and Plaintiff stopped.

p. Plaintiff continued to ask for sex and Jane Doe continued to say no. Jane Doe mentioned to the police that she was unresponsive during this time as well.

q. Eventually, Jane Doe snapped out of her daze and realized what was happening.

r. She asked why she was naked and where her clothes were. Plaintiff told her that she took off her clothes and he did not know where they were.

s. Plaintiff then left the room and Jane Doe got dressed fast and tried to leave.

t. In the hallway, she saw Plaintiff and froze, before saying "I have to go" and getting into the elevator. Jane Doe sat on the floor of the elevator crying and then, after stopping to tie her shoes, walked to her dorm approximately 10 minutes away. See Exhibit 2 for a side-by-side listing of discrepancies between Plaintiff and Jane Doe's versions of events.

## H.   Defendant's Disciplinary Proceedings against Plaintiff

96. On November 17, 2017, Plaintiff received an email from Kari Hohn, Defendant's Title IX Manager informing him that he had been accused of engaging in "sexual contact with [Jane Doe] while she was incapacitated and incapable of consenting to sexual contact." The letter also informed Plaintiff that the proceedings against him would proceed under the Formal Resolution Process, that Mary Dunnewold had already been selected to conduct the investigation, that Vice President for Student Life Greg Kneser and Dean of Students Roz Eaton would comprise the Adjudication Panel, that he would have only two days to make a challenge to any of these parties, that he was to have no contact with Jane Doe, and that he would be restricted from being on campus. See Exhibit 3 – November 17, 2017 Letter from Kari Hohn.

97. Mary Dunnewald, the investigator, is an alumna of St. Olaf, majoring in women's studies, and is the Title IX investigator at neighboring Carleton College.

98. Plaintiff also received a separate document entitled "No Contact Order", dated November 17, 2017. That document informed Plaintiff that he was restricted from entering "any residence hall" and that he could only be on campus to attend classes between 7:30 am and 2:00 pm on

Monday, Wednesday, and Friday, from 11:00 am to 1:40 pm on Tuesdays, and 12:00 pm to

2:35 pm on Thursdays.

99. The investigation consisted of interviews with eight (8) St. Olaf students, including Plaintiff

and Jane Doe. Aside from Plaintiff and Jane Doe, there was no one else who had any direct

information about what occurred.

100.    During the process, Plaintiff was denied access to the actual allegations made by Jane

Doe, had restrictions on his ability to view and record information contained in the

Investigator's report, was denied access to the video recordings from the dorms, was denied

access to social media communications Jane Doe made relative to the allegations against

Plaintiff, and was denied legal representation during questioning.

101.    Plaintiff also recommended that Ms. Dunnewold interview JL, who lived in the dorm

across the hallway from Plaintiff. Plaintiff anticipated JL had information that was

exculpatory in nature.

102.    The investigator apparently attempted to interview JL, who was recommended by

Plaintiff, but when JL did not make it to his scheduled interview, the Investigator determined

that the information "he might offer would be duplicative of information [BM] supplied, so I

did not reschedule the interview."

103.    On December 4, 2017, Plaintiff received an email from Kari Hohn informing him that the

close of evidence in the investigation was scheduled for 5:00 pm on December 5, 2017 and

that no further evidence would be accepted or considered after that time.

104.    On December 8, 2017, Plaintiff received an email from Kari Hohn stating that the

investigator had completed her investigation and had prepared an Investigation Report. He

was informed he had a right to review the Report, recordings of interviews, and other information gathered by the investigator. He was also informed that this, along with any response he wished to file, had to be completed within five (5) business days. Plaintiff was also informed that he was not allowed to have his phone present, was not allowed to have or make copies of any documents, and had to review the materials in a room designated for that purpose in Tomson Hall.

105.    In Response, Plaintiff requested additional time to conduct the review and provide a response given his finals schedule and requested that he be allowed to have his father present for the review.

106.    In Response, Ms. Hohn told Plaintiff that he could switch advisors one time during the proceedings but then could not make any other changes.

107.    Ultimately, based on some policy that is not written anywhere, Plaintiff was prohibited from making a change in his advisor. Exhibit 4 – December 8 -12 Email Chain with Kari Hohn.

108.    During his review of the Investigation Report, on December 12-13, 2017, Plaintiff learned the Investigator had obtained the following information:

   a.  Interviews with nine individuals including: Plaintiff, Jane Doe, MS, MS, ES, BD, ER, DN, and BM,

   b.  Text messages between Jane Doe and MS from the morning of November 12, 2017, and

   c.  Video footage showing Jane Doe entering and exiting Plaintiff's dorm building.

109.    On December 18, 2017, Plaintiff provided a written response to the Investigation Report.

In that letter, Plaintiff noted that he felt his ability to defend himself was compromised by

Defendant's self-imposed timeline, particularly given the amount of information to review

and the severe limits placed on his ability to review the information. He also noted a desire to

be provided with additional relevant information including:

- Any materials submitted or gathered in this matter before the request for a formal investigation was made.
- Any materials or statements provided to the Northfield Police Department by the college and/or the Complainant or other witnesses in connection with this matter.
- The complete results of the forensic exam of the Complainant, which appears to have been conducted.
- All texts and emails, Twitter messages, etc, sent by the Complainant and received by the Complainant in connection with this matter to date. The investigation materials contain only one brief text exchange.
- All videos from Mohn Hall (hallways, restrooms, elevator, etc) that might depict any of the participants and witnesses related to this incident. The investigation materials reference only videos showing the entrance and exits from Mohn and Kittlesby halls.
- Access to training videos the Complainant may have seen regarding sexual harassment/sexual assault.
- A list of any academic or other accommodations or benefits made or provided to the Complainant by the college in connection with this matter.
- A list of all information received by the college upon which the No Contact order issuance was based.

110.    On December 19, 2017, Plaintiff also sent Defendant an addendum to his prior response,

providing additional information he believed was essential to making an accurate

determination of what had happened.

111.    On December 20, 2017, Plaintiff received an email from Kari Hohn informing him that

the Investigator's Decision Letter would be sent to him at 3:30 pm that day. The email also

informed him that if he wished to appeal the investigator's decision, he was required to

submit an appeal letter to Ms. Hohn within three (3) business days. Exhibit 5 - December 20, 2017 Email from Kari Hohn to Plaintiff.

112.    In response to that email, Plaintiff emailed Kari Hohn inquiring how a decision could have already been made in light of his response to the Investigative Report and his request to review additional evidence against him. No response to that email was received. Exhibit 6 – December 20, 2017 email from Plaintiff to Kari Hohn.

113.    At 3:30 on December 20, 2017, Plaintiff received the Decision Letter finding by a preponderance of the evidence that Plaintiff had sexually assaulted Jane Doe. Exhibit 7 – Decision Letter. That letter determined that Jane Doe was not incapacitated (which refuted the original charge against Plaintiff), but that Plaintiff had not obtained consent for each of the types of sexual contact that occurred. Specifically, the investigator found that Jane Doe had consented to the kissing and some of the fondling that occurred early in Plaintiff's room. The Letter went on to conclude that Plaintiff had not obtained consent to remove Jane Doe's pants and underwear or to touch her vagina, pointing to Plaintiff's statement that when he removed Jane Doe's pants, she made a noise he did not understand and that he shook her to get her attention and then she lifted her hips and moved to help him remove her pants. That letter stated "A reasonable person would not believe that an inaudible response, which the receiving party could not understand, and which the receiving party elicited by shaking the uttering party, constituted clear consent. Further, a reasonable person would not believe that the movement of another person's legs, after they had to be shaken to elicit a response, would amount to clear consent to proceed with sexual activity."

114.   Regarding the "vaginal-digital contact," the Letter concluded that even if Jane Doe did move toward Plaintiff after her pants were off, that was not consent because "A reasonable person would not believe that [Jane Doe's] slight movement, especially in the absence of other responses or engagement, while appearing to be asleep so that there was a need to try to awake her, and in the presence of an unintelligible response to being roused, would constitute clear and affirmative consent to proceed with sexual contact."

115.   The letter also concluded that Jane Doe did not consent to having her hand placed on John Doe's penis because "A reasonable person would not believe that having a hand near the crotch, in the context where the other person had been perceived multiple times to be asleep and unresponsive to sexual activity, constituted consent to having that hand placed on the person's penis."

116.   After Plaintiff received this document, he requested additional time to respond beyond the three (3) business days he was given while away from campus for Christmas break. He was given until January 2, 2018.

117.   No communication was received by Plaintiff in response to his request for additional information in any way.

118.   Plaintiff filed an appeal of the Investigator's Findings on January 2, 2018, arguing that the conclusions in the decision letter were clearly erroneous and that the proceedings against him had been fundamentally flawed and designed solely to reach the conclusion that he was responsible for sexual assault. Specifically, Plaintiff argued that the investigation had not maintained the presumption that he was not responsible for misconduct as evidenced by the imposition of immediate and severe interim sanctions removing him from campus, that the

investigation had failed to identify and review all relevant evidence, that the investigator

failed to ask questions of Jane Doe that Plaintiff requested about the events at issue, and that

Plaintiff was repeatedly denied access to the documents and evidence against him despite his

request that he be allowed to review it.

119.    By a letter dated January 11, 2018, Plaintiff was informed that the Investigator's findings

had been upheld by the Adjudication Panel. Plaintiff was informed that, based on an

Adjudication Panel meeting alleged to have taken place on January 12, 2018, he was

expelled from St. Olaf effective immediately and that the decision was final with no right to

appeal either the factual determination of the Adjudication Panel or its sanctions. See Exhibit

8 – January 11, 2018 Adjudication Panel Letter.

## COUNT I
### Declaratory Judgment – Title IX

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the

regulations promulgated thereunder require a school receiving federal funds to "adopt and

publish grievance procedures providing for the prompt and equitable resolution of student . .

. complaints alleging any form of sexual harassment, including sexual assault.[30] These

procedures must "accord[ ] due process to both parties involved . . . ."[31]

122.    Upon information and belief, Defendant receives federal funds and must comply with

Title IX.

---

[30]     34 C.F.R. § 106.8(b)
[31]     2001 Guidance at 20.

123.    The "prompt and equitable" procedures that a school must implement to "accord due

    process to both parties involved" must include, at a minimum: (a) "[n]otice . . . of the

    procedure, including how complaints may be filed"; (b) "[a]dequate, reliable, and impartial

    investigation of complaints"; (c) "the opportunity to present witnesses and other evidence";

    and (d) "[d]esignated and reasonably prompt timeframes for the major stages of the

    complaint process." A school must also ensure that all employees involved in the conduct of

    the procedures have "adequate training as to what conduct constitutes sexual harassment,"

    which includes "alleged sexual assaults."[32]

124.    As written, the Defendant's student disciplinary process in effect in the 2017-2018 school

    year violated Title IX and the regulations thereunder, which have the force of law, including

    the requirements that: the procedures comport with due process, be "prompt and equitable,"

    uphold the preponderance of the evidence standard, and Defendant deliver to Plaintiff

    written notice of the outcome of the investigation and the rationale therefor.

125.    Those violations include, but are not limited to, the following: (a) the lack of a

    meaningful hearing process wherein Plaintiff had an opportunity to present evidence and

    subject the evidence against him to adversarial testing, (b) failure to provide Plaintiff with

    written notice of the determination and the rationale therefor, (c) the lack of a meaningful

    right to appeal because Plaintiff was never made aware of the evidence against him and

    because the appeal was not as of right, but rather a discretionary request for appeal, and (d)

---

[32] 2001 Guidance at 21.

presuming Plaintiff's guilt by maintaining a policy that explicitly states that corroboration of the allegations against Plaintiff is unnecessary.

126.    As implemented, Defendant's student disciplinary process in effect during the 2017-2018 school year, including the Policy Prohibiting Discrimination, Harassment and Related Misconduct, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process, be "prompt and equitable," uphold the preponderance of the evidence standard, and Defendant deliver to Plaintiff written notice of the outcome of the investigation and the rationale therefore. Those violations, which are described above, include, but are not limited to, the following: (a) the lack of a meaningful hearing process wherein Plaintiff had an opportunity to present evidence and subject the evidence against him to adversarial testing, (b) failure to provide Plaintiff with written notice of the determination and the rationale therefor, (c) the lack of a meaningful right to appeal because Plaintiff was never made aware of the evidence against him and because the appeal was not as of right, but rather a request for appeal, (d) and presuming Plaintiff's guilt by maintaining a policy that explicitly states that corroboration of the allegations against Plaintiff is unnecessary.

127.    As applied to Plaintiff, Defendant's student disciplinary process in effect during the 2017-2018 school year, including the Policy Prohibiting Discrimination, Harassment and Related Misconduct, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations which are described above, include, but are not limited to, the following: (a) the failure to perform a threshold evaluation of the charge,

including denying Plaintiff the right to tell his side of the story; (b) the failure to conduct a "thorough, reliable and impartial" investigation with a trained investigator; (c) the failure to set an appropriate, fair hearing date that would have allowed Plaintiff to rely on exculpatory evidence; (d) the failure to provide fair and meaningful notice of the charges; (e) the refusal to contact witnesses identified by Plaintiff; (f) the failure to provide an unbiased disciplinary process and tribunal; (g) the failure to ensure that Plaintiff be presumed innocent and that Defendant had the burden of proof; (h) the failure to ensure that there be sufficient evidence to support the Investigator's conclusion; (i) otherwise acting to achieve a predetermined result, *i.e.*, a finding that Plaintiff committed sexual assault or some related offense.

128.   Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, Plaintiff is entitled to (a) a declaratory judgment that Defendant's 2017-2018 student disciplinary process, including the Policy Prohibiting Discrimination, Harassment and Related Misconduct, was, as written, violated Title IX (including its due process requirements); (b) a declaratory judgment that the Defendant's student disciplinary process as implemented, violated Title IX (including its due process requirements); (c) a declaratory judgment that Defendant's student disciplinary process as applied to Plaintiff, violated Title IX (including its due process requirements); and (d) further necessary or proper relief.

## COUNT II
### Violation of Title IX – Erroneous Outcome from a Flawed Proceeding

129.   Plaintiff repeats and realleges paragraphs 1 through 128 as if fully set forth herein.

130.   Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.

131. Upon information and belief, Defendant receives federal funds and must comply with Title IX.

132. A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

133. As set forth above, Defendant engaged in a series of rushed actions that ultimately resulted in the erroneous finding that Plaintiff committed sexual assault. This represents disparate treatment of Plaintiff by Defendant on the basis of his sex.

134. As fully set forth above, there were significant evidentiary weaknesses underlying Defendant's finding, including:

   a. The absence of any evidence Jane Doe objected to the sexual contact,

   b. Failure to fully interview all witnesses, ask appropriate relevant questions, view all communications (via text, social media, snapchat) by Jane Doe,

   c. Potential bias and interest in finding the Plaintiff responsible to show compliance with Title IX,

   d. No opportunity to have an attorney represent the Plaintiff,

   e. No opportunity to question Jane Doe regarding the allegation of sexual assault,

   f. No opportunity to view all the evidence, particularly exculpatory evidence,

   g. Unnecessary haste in reaching a conclusion despite the federal government removing the 60 day timeline for completing investigations,

   h. Failure of investigation to take into consideration Jane Doe's state of mind in making the allegations and whether they were instigated by her regret and/or friends'

retaliatory urging to report, and whether she was biased against Plaintiff because of his race,

   i.   No access to forensic evidence.

135.   In addition to the lack of evidence against Plaintiff, there were, as set forth above, numerous procedural flaws that affected the proof, including the lack of an appropriate investigation by a properly trained and unbiased investigator; the refusal to provide Plaintiff with a hearing wherein he could contest the allegations against him, the prohibition on Plaintiff being allowed to conduct his own investigation or contact any potential witness, the presumption of guilt applied to Plaintiff from the outset, and the impermissible shifting of the burden of proof to Plaintiff.

136.   The erroneous outcome of the hearing and purported appeal can only be explained by gender bias against males in cases involving allegations of sexual assault. This bias is reflected in the patterns of decision making by Defendant throughout the entire process and by the biased training agents of Defendant received.

137.   Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at St. Olaf, the accused student is male and the accusing student is female. Defendant has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX and the US Constitution. This significant gender-based statistical disparity demonstrates the existence of discrimination. In fact, Defendant impermissibly presumes male students "guilty until proven innocent" based on invidious gender stereotypes and has codified this by policy.

138.    There are at least four causes for this discriminatory environment at St. Olaf. First, acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in Defendant's loss of federal funding. There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

139.    Second, Defendant's officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles.

140.    Third, these officials also focus on what would be most expedient for St. Olaf and, in particular, avoiding publicity that could harm its image and brand, and hinder its efforts to attract tuition-paying students, particularly in light of the criticism it received related to its handling of a priest professor accused of sexual assault. The safer course for these officials is to convict all accused male students rather than face the negative publicity associated with decisions such as those made in the Madeline Wilson case.

141.    Fourth, Defendant's officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of the accused male students. Defendant and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Policy Prohibiting Discrimination, Harassment and Related Misconduct.

142.    Fifth, Defendant waited for police to question Plaintiff and charged Plaintiff two (2) days after the initial report was made and five (5) days after the incident. Defendant thus colluded

with the Northfield Police Department whose officers used deceptive tactics to try to entrap John Doe, a student of color, and elicit statements from him under duress and without legal counsel.

143.   The unusual facts of Plaintiff's case led him to experience this invidious gender bias and discriminatory environment more acutely than the typical accused male student in a "he said/she said" situation. Before even hearing any of Plaintiff's version of events, Defendant's officials had banned him from his residence and restricted his ability to be on campus except to attend class and take finals. Officials in charge of and involved in the disciplinary process refused to contact and interview witnesses identified by Plaintiff, blatantly ignored the fact that Jane Doe has never stated that Plaintiff continued with any conduct she objected to, conducted a secret and rushed investigation, and then refused to provide Plaintiff with the factual basis for the determination that he committed sexual assault.

144.   The September 2017 Q&A reaffirms the vitality of the 2001 Guidance and is OCR's latest interpretation of Title IX as it relates to sexual assault proceedings on campus. As set forth in the Letter, OCR states that compliance with Title IX requires the following:

   a.  A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."[33]

   b.  "**Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence**, once notified that

---

[33]     *Id.* at 8.

the police department has completed its gathering of evidence . . . , the school must

promptly resume and complete its fact-finding for the Title IX investigation."[34]

c.  The complainant and the accused student "**must have an equal opportunity to**

**present relevant witnesses and other evidence**."[35]

d.  The complainant and the accused student "must be afforded similar and timely access

to any information that will be used at the hearing. For example, a school should not

conduct a pre-hearing meeting during which only the [complainant] is present and

**given an opportunity to present his or her side of the story**, unless a similar

meeting takes place with the [accused student]."[36]

e.  "**Schools must maintain documentation of all proceedings**, which may include

written findings of fact, **transcripts, or audio recordings**."[37]

f.  "[S]chools [should] provide an appeals process."[38]

g.  "In sexual violence cases, the fact-finder and decision-maker also should have

**adequate training or knowledge regarding sexual violence**."[39]

h.  "If an investigation or hearing involves forensic evidence, that evidence should be

reviewed by a **trained forensic examiner**."[40]

145.  The conclusion of the investigative process can only be explained by gender bias and an

improper process. Plaintiff, based solely on his gender, suffered an erroneous outcome of the

---

[34]   *Id.* at 10 (emphasis added) (footnote omitted).
[35]   *Id.* at 11 (emphasis added).
[36]   *Id.* (emphasis added).
[37]   *Id.* at 12 (emphasis added).
[38]   *Id.*
[39]   *Id.* (emphasis added).
[40]   *Id.* (emphasis added).

disciplinary process. This unlawful discrimination by Defendant, in violation of Title IX

proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but

not limited to: mental anguish; severe emotional distress; injury to reputation; past and future

economic loss; deprivations of due process; loss of educational opportunities; and loss of

future career prospects.

### COUNT III
**Negligence**

146.  Plaintiff repeats and realleges paragraphs 1 through 145 as if fully set forth herein.

147.  Having put in place a student disciplinary process, including the Policy Prohibiting

Discrimination, Harassment and Related Misconduct, Defendant owed a duty of care to

Plaintiff and others to conduct that process in a non-negligent manner and with due care to

avoid arbitrarily dismissing students.

148.  The conduct of Defendant and its agents fell below the applicable standard of care and

amounted to breaches of the duty of due care and incompetence. This conduct included, but

was not limited to, implementing its Policy in a manner that is biased on the basis of gender,

failing to proceed with a presumption of innocence, and failing to implement the policy in a

manner that would result in a fair process, tilted to favor a particular outcome by not having

a fair and neutral fact finder.

149.  These breaches of the duty of due care caused Plaintiff, in fact and proximately, to

sustain substantial injury, damage, and loss, including, but not limited to: mental anguish;

loss of trust; severe emotional distress; injury to reputation; past and future economic loss;

deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT IV
### Title VI, 42 U.S.C. § 2000d

150.  Plaintiff repeats and realleges paragraphs 1 through 149 as if fully set forth herein.

151.  42 U.S.C. § 2000d, commonly referred to as Title VI, and its implementing regulations prohibit discrimination in a federally-funded school on the basis of a student's race.

152.  Plaintiff was subjected to harassment, discrimination, and disparate treatment on the basis of his race when he was removed from St. Olaf on the basis of allegations that did not result in the removal of similarly situated Caucasian students.

153.  St. Olaf intentionally, willfully, and without justification acted to deprive Plaintiff of this rights, privileges and immunities secured to him by the laws of the United States.

154.  St. Olaf, despite knowledge and adequate opportunity to learn of its misconduct failed to take action to remedy the harassment, discrimination, and disparate treatment of Plaintiff.

155.  As a result of St. Olaf's conduct, customs, policies, and practices, Plaintiff was unjustly and discriminatorily deprived of equal education opportunities and benefits.

## COUNT V
### Minnesota Human Rights Act, § 363A.13

156.  Plaintiff repeats and realleges paragraphs 1 through 155 as if fully set forth herein.

157.  Minn. Stat. § 363A.13 prohibits discrimination on the basis of, but not limited to, race, color, creed, and national origin in any educational institution.

158.  As such, St. Olaf had a duty to provide Plaintiff with an educational atmosphere free of racial discrimination.

159.    Defendant failed to take adequate steps to provide Plaintiff with an educational

atmosphere free of racial discrimination.

160.    As a result of St. Olaf's conduct, customs, policies, and practices, Plaintiff was unjustly

and discriminatorily deprived of equal education opportunities and benefits.

### RELIEF REQUESTED

WHEREFORE, plaintiffs pray for judgment against defendants, jointly and severally, and

ask this Court to:

1. issue a judgment that (a) declares the Defendant's student disciplinary process,

including the Policy Prohibiting Discrimination, Harassment and Related Misconduct, as

written, as implemented, and as applied to Plaintiff, to be in violation of Title IX, including its

due process requirements; (b) requires Defendant to expunge the entire disciplinary proceeding

from its records; (c) declares Defendant's conduct to be wrongful, willful, intentional, and

reckless; (d) prohibits Defendant from referencing Plaintiff's disciplinary proceeding in the

event of any third-party inquiry; and (e) declares that upon any third-party inquiry, Plaintiff may

reply in the negative as to any question as to whether he has been accused of sexual misconduct

or as to any similar question.

2. award plaintiff compensatory damages in an amount to be determined at trial, but not

less than $75,000.00 for mental anguish, loss of trust, severe emotional distress, serious mental

injury, injury to reputation, past and future economic loss, deprivations of due process, loss of

educational opportunities, loss of future career prospects, and other injuries proximately caused

by the wrongful conduct of defendants;

3. award plaintiff his attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

4. award prejudgment interest; and grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.

Dated: 9/10/18

_John Doe_
John Doe

Dated: 9/11/18

**MCGRAW LAW FIRM, P.A.**

Beau D. McGraw, I.D. No.: 31190X
Attorney for Plaintiff
10390 39th Street North, Suite 3
Lake Elmo, MN 55042
Telephone: (651) 209-3200
beau@mcgrawlawfirm.com