

St. Olaf College
1520 St. Olaf Avenue
Northfield, MN 55057

stolaf.edu

December 20, 2017

▇▇▇▇
Sent electronically to ▇▇▇▇

PERSONAL AND CONFIDENTIAL

Regarding Case Number: ▇▇▇▇

## Sexual Misconduct Investigation Decision Letter

## St. Olaf College

## Mary Dunnewold, Investigator and Adjudicator

## December 20, 2017

This is the Investigator's Decision Letter following the investigation into a sexual misconduct report made by ▇▇▇▇ (Reporting Party) on November 15, 2017. ▇▇▇▇ alleges that ▇▇▇▇ (Responding Party) engaged in sexual assault in violation of St. Olaf College's Policy Prohibiting Discrimination, Harassment, and Related Misconduct.

▇▇▇▇ alleges that ▇▇▇▇ engaged in nonconsensual sexual contact with her in his ▇▇▇▇ Hall dorm room in the early morning hours of November 12, 2017, including removing her pants and underwear without her consent, touching her genital area without consent, and placing her hand on his penis without her consent. She also alleges that she was incapacitated due to alcohol consumption at the time of the nonconsensual sexual contact.

St. Olaf retained me, an independent investigator, to investigate and adjudicate these allegations. Both ▇▇▇▇ and ▇▇▇▇ were separately interviewed, and both were given an opportunity to submit evidence and name witnesses to be interviewed. Both were provided the opportunity to review the investigation file, including the Investigation Report summarizing the relevant information and the supporting documents and security videos. Consistent with St. Olaf's report process, each party was then given an opportunity to submit a response to the Investigation Report. ▇▇▇▇ submitted a response. ▇▇▇▇ declined to submit a response. Throughout the process, both parties were given an opportunity to have an advisor present at all meetings related to the process. ▇▇▇▇ declined to have an advisor accompany her to her initial meeting or her follow up meeting. ▇▇▇▇ was accompanied to his interview by his advisor.

Exhibit 7

Pursuant to St. Olaf's Policy, upon completing the investigation phase of the report process, my role is to determine, using the preponderance of the evidence standard, whether ▇ violated the Policy. The Policy states that there is a presumption of non-responsibility on the part of the Responding Party, and the Responding Party will not be deemed responsible absent evidence establishing that it is more likely than not that they violated the Policy. In reaching my decision, I relied on information contained in the Investigation Report, the audio recordings, ▇ written response to the Investigation Report, and St. Olaf's Policy.

**Relevant Policy Definitions**

Sexual Assault

St. Olaf's Policy prohibits sexual assault. Sexual assault is defined as follows:

Sexual assault is a form of sexual harassment and sexual violence. Sexual assault is any sexual contact with another person who does not or cannot give consent. This may or may not include force. Sexual assault includes, but is not limited to:

- Rape (the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of any person, without the consent of the victim);
- Fondling (the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim).

Sexual Contact

St. Olaf's Policy defines sexual contact as follows:

Sexual contact is defined under Minnesota law as the intentional touching by an individual of another's intimate parts (including an individuals' breasts, inner thighs, buttocks, genitals and or/groin area, whether clothed or unclothed); or the coerced touching by an individual of another's intimate parts. Sexual contact also includes the intentional removal or attempted removal of clothing covering an individual's intimate parts.

Consent

St. Olaf's Policy defines consent as follows:

Consent is words or overt actions by a person clearly and affirmatively communicating a freely given, present agreement to engage in a particular form of sexual contact. Words or overt actions clearly communicate consent when a reasonable person in the circumstances would believe those words or actions indicate a willingness to participate in the mutually agreed-upon sexual contact. Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and obtaining consent.

All parties to a particular form of sexual contact must provide consent, and such consent must be present throughout the activity. It is the responsibility of the individual who is initiating each sexual contact to obtain consent before proceeding to engage in the sexual contact.

Even when consent is given, it may be retracted at any time. When consent is withdrawn, the sexual

contact for which consent was initially provided must stop immediately. Any words or overt actions can communicate withdrawal of consent. As is the case with communicating the existence of consent, verbal communication is usually the clearest way of communicating withdrawal of consent.

A person can only provide consent when that person:

- Acts freely and voluntarily, without coercion or force or otherwise feeling unduly pressured, threatened, intimidated;
- Is informed about the nature of the sexual contact involved;
- Is not incapacitated, whether from alcohol, other drugs, or other causes, such that they cannot understand the fact, nature, or extent of the sexual contact;
- Is conscious.

These requirements for consent mean that sexual contact with someone who is threatened, coerced, intimidated, uninformed, incapacitated, asleep or otherwise unconscious, or not of legal age, is by definition sexual assault.

In addition, consent to a particular sexual contact cannot be inferred from:

- Consent to a different form of sexual contact;
- An existing or prior dating, sexual, romantic or marital relationship;
- Silence that is not otherwise accompanied by overt actions indicating consent;
- An absence of physical resistance or verbal protest; or
- Prior sexual activity with other individuals.

Incapacitation

St. Olaf's Policy states the following regarding incapacitation:

Incapacitation means an individual's physical and/or mental inability to make informed, rational judgments that is known or reasonably should have been known to the individual initiating sexual contact. An individual who is incapacitated is unable to give consent to sexual contact. States of incapacitation include sleep, unconsciousness, intermittent consciousness, or any other state where the individual is unaware that sexual contact is occurring. Incapacitation may also exist because of a mental or developmental disability that impairs the ability to consent to sexual contact.

Regardless of their own level of intoxication, individuals who are initiating sexual contact are always responsible for obtaining consent before proceeding. Intoxication is never an excuse for or a defense to committing sexual assault or any other Prohibited Conduct. Use of drugs or alcohol does not diminish one's responsibility to obtain consent, or reduce one's personal accountability or criminal liability. The issue is whether the individual initiating sexual contact knew, or a reasonable sober person in the position of the individual initiating sexual contact should have known, that the other person was incapacitated.

Alcohol or drug use is a common cause of incapacitation. The mere use of drugs or alcohol, or even intoxication from drugs or alcohol is not by itself proof of incapacitation. Where alcohol or drug use is involved, incapacitation is a state beyond intoxication, impairment in judgment, or drunkenness. Because the impact of alcohol or other drugs varies from person to person, evaluating

whether an individual is incapacitated, and therefore unable to give consent, requires an assessment of whether the consumption of alcohol or other drugs has rendered the individual physically helpless or substantially incapable of:

- Making decisions about the potential consequences of sexual contact;
- Appraising the nature of one's own conduct; or
- Ability to communicate consent or lack of consent to engage in sexual contact.

There are common signs that should alert a reasonable sober person as to whether an individual might be incapacitated. Typical signs include slurred or incomprehensible speech, clumsiness, difficulty walking, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know who I am?" If there is any doubt as to the level or extent of one's own or the other individual's intoxication or incapacitation, the safest course of action is to forgo or cease any sexual contact.

**Findings and Rationale**

Having reviewed St. Olaf's Policy, the Investigation Report, the attachments to the Report, the audio recordings, and ▮▮▮ response to the Report, and for the reasons provided below, I conclude that there is sufficient evidence to find that it is more likely than not that ▮▮▮ violated the College's Policy prohibiting sexual assault.

*Incapacitation*

First, I conclude that there is insufficient evidence to find that it is more likely than not that ▮▮▮ was incapacitated by alcohol at the time the sexual contact occurred. Thus, incapacitation because of alcohol consumption did not result in an incapacity to consent.

The Policy's definition of incapacitation states "incapacitation is a state beyond intoxication, impairment in judgment, or drunkenness." Further, "evaluating whether an individual is incapacitated, and therefore unable to give consent, requires an assessment of whether the consumption of alcohol or other drugs has rendered the individual physically helpless or substantially incapable" of understanding the conduct or communicating about consent. Signs of incapacity include a lack of understanding of where the person is, who they are with, or what they are doing.

The evidence shows that at the time the sexual contact commenced and the alcohol consumption ceased, around 2:45 a.m., ▮▮▮ was walking proficiently, engaging in conversation, and talking proficiently. ▮▮▮ and ▮▮▮ indicated that ▮▮▮ seemed tipsy or intoxicated, but was engaged in the conversation, including a conversation about where she was going to stay for the rest of the night. While ▮▮▮ indicated that ▮▮▮ was slurring words and had "big floppy movements," there was no information suggesting the ▮▮▮ was beyond a state of intoxication or drunkenness. She navigated the dorm, found the bathroom when she left ▮▮▮ room, and found her way back to his room. ▮▮▮ own account and the witnesses' accounts indicated that this all occurred around 2:30 or 2:45 a.m. While ▮▮▮ estimated that he first suggested he was returning to his room around 2:15 a.m., that estimate is not substantially different than the estimates the other witnesses gave. Thus, the evidence supports the conclusion that between 2:15 a.m. and 2:45 a.m., ▮▮▮

was intoxicated but not incapacitated. In addition, on the security footage from the entry to ▬ Hall, ▬ appears to be walking normally at 5:09 a.m. She also walked without incident back to her own dorm, ▬, a ten-minute walk, and she appears to be walking normally on the ▬ security footage when she enters that building at 5:21 a.m. Thus, the evidence establishes that at both around 2:30 a.m. and at around 5 a.m., ▬ knew where she was, who she was with, and what she was doing. I conclude that it is more likely than not that she was intoxicated, but not incapacitated, in the intervening 2.5 hours.

According to the Policy's definition of incapacitation, incapacitation can also be present if a person is asleep. If a person is asleep, they are unable to consent to sexual contact. I find the evidence to be inconclusive about whether ▬ was asleep at any point during the encounter in ▬ room and thus unable to consent to sexual contact.

▬ told me that she remembers everything from the encounter, but her memories are foggy and she does not remember vivid detail. She did not tell me that she lost consciousness or fell asleep, although she did say she felt disoriented, "shut down," tired, and overwhelmed. ▬ told me that he thought ▬ was asleep several times during the encounter. In response, several times he shook her or otherwise attempted to wake her up. He told me that at one point, he thought she looked passed out. At that point, after he had attempted to awaken her several times during the encounter, he decided to also sleep. It is inconclusive from these accounts whether ▬ appeared to be asleep or was in fact asleep. Thus, I find that there is insufficient evidence to conclude that it was more likely than not that ▬ was unable to consent because she was incapacitated by sleep.

*Consent*

Regarding consent, I conclude that there is sufficient evidence to find that it is more likely than not that ▬ did not consent to each type of sexual contact that occurred. I find that the evidence supports the conclusion that ▬ did consent to the kissing the parties engaged in and some of the fondling that occurred early in the encounter in ▬ room. I find that the evidence supports the conclusion that ▬ did not consent to the removal of her pants and underwear, did not consent to having her hand placed on ▬ penis, and did not consent to vaginal-digital contact by ▬. I find that the evidence is inconclusive regarding whether oral-genital contact occurred.

First, regarding kissing and fondling early in the encounter, ▬ told me that when she and ▬ were first alone in his room and they started kissing she was "not necessarily objecting." ▬ told me that ▬ was pressed up against him at this point and that they mutually removed clothing. While ▬ said that ▬ initiated the contact, and ▬ said that she initiated the contact, in either case, ▬ statement that ▬ was participating and engaged at this point is credible. Also, the parties agree that the kissing and contact that occurred during the Truth or Dare game, while they were in ▬ and ▬ room, was consensual.

According to the Policy's definition of consent, however, consent to one type of sexual contact does not imply consent to another type of sexual contact, and consent to sexual contact must be present throughout sexual activity. Regarding, ▬ removal of ▬ pants and underwear, and his digital contact with her genital area, the evidence supports the conclusion that ▬ did not consent. ▬ told me that at the point in the encounter when he told ▬ he was going to remove her pants, she said something in response that he did not understand, so he shook her a little and asked a couple more times. He reported that she did not give an audible response to his inquiry.

He then proceeded to pull down her pants. While he said that she moved so that it made it possible for him to remove her pants and her underwear, this movement, especially in the presence of an inaudible, unintelligible response, does not amount to the affirmation of consent required by the Policy. To be valid, consent must be clearly and affirmatively communicated and freely given. While the parties agree that ▌ asked whether he could proceed before engaging in different activities, receiving a response but failing to ascertain what that response actually communicated cannot reasonably be the basis for proceeding with the sexual contact. Further, the Policy requires that a reasonable person in the circumstances would believe the words or actions indicate a willingness to participate in the activity. A reasonable person would not believe that an inaudible response, which the receiving party could not understand, and which the receiving party elicited by shaking the uttering party, constituted clear consent. Further, a reasonable person would not believe that the movement of another person's legs, after they had to be shaken to elicit a response, would amount to clear consent to proceed with sexual activity.

Similarly, the evidence does not support a conclusion that ▌ consented to vaginal-digital contact. ▌ told me he relied on ▌ "slight" movement towards him after he had removed her pants to conclude that he had consent to touch her genital area. He told me that she did not respond much to his action, so he stopped and attempted to wake her, believing her to be asleep. He thought she woke up so he again touched her genital area. She again did not respond "as he expected," so he again tried to wake her up. At this point, she said something he did not understand. A reasonable person would not believe that ▌ slight movement, especially in the absence of other responses or engagement, while appearing to be asleep so that there was a need to try to awaken her, and in the presence of an unintelligible response when being roused, would constitute clear and affirmative consent to proceed with sexual contact.

I also conclude that ▌ statement that she was shut down, lying still, and not responding or reciprocating the activity, and thus not affirmatively communicating consent, is credible, considering ▌ own statements that he had to shake her to elicit a response from her and that he several times stopped what he was doing to try to awaken her because she was not responding. ▌ statements that ▌ would ask if he could take certain actions and she would say no, or say that she was tired and just wanted to go to sleep, are also credible. ▌ said that he would ask her if he could take a certain action, and ▌ would "mutter" in response or respond in a way he could not understand. Thus, the parties agree that exchanges occurred. ▌ account of what she was saying or trying to say are uncontradicted; ▌ did not follow up to try to clarify what she had actually said.

Further, I conclude that the evidence supports the conclusion that ▌ did not consent to having her hand placed on ▌ penis. The parties' accounts of this part of the encounter were similar. ▌ told me that ▌ placed her hand on his penis, but that her arm was limp and she was not participating. ▌ told me that her hand was close to his crotch, so he thought she was reaching for his penis. He pulled his shorts down and put her hand on his penis, but she did not stroke him, and, when he looked at her face, he thought she was passed out. A reasonable person would not believe that having a hand near the crotch, in a context where the other person had been perceived multiple times to be asleep and unresponsive to sexual activity, constituted consent to having that hand placed on the person's penis.

Finally, after the encounter, both parties acted in a manner consistent with a lack of consent. ▌ account that she left the room in a hurry and did not stop to tie her shoes is corroborated by the video from the ▌ Hall entrance, which shows her stopping in the airlock to tie both of

her shoes. Further, her text to ▮ at 5:10 a.m., which she sent while walking from ▮ to ▮, said that "bad happened," and her follow-up text exchange with ▮ several hours later shows that she was distraught about the interaction. ▮ roommate, ▮, told me that ▮ told him he had been with a girl who was passed out and he continued to take off her clothes. ▮ friend ▮ told me that ▮ said he'd had a girl in his bed, he was not aware she was passed out, and he took off her clothes. ▮ himself said that when he was in the bathroom after the encounter, he "had a feeling that ▮ might've not realized anything that happened because of how she acted when I woke her up that final time." Thus, ▮ reports to his friends and his own feelings after the encounter indicated that there was a lack of consent during the encounter.

▮ response to the Investigation Report suggests that because ▮ was free to leave the room, and in fact did so when she left to go to the bathroom, and because she engaged in some consensual activity with him earlier in the evening, specifically kissing, that the entire encounter was consensual. But under the Policy's definition of consent, "it is the responsibility of the individual who is initiating each sexual contact to obtain consent before proceeding to engage in the sexual contact." Consent to kissing does not imply consent to vaginal fondling. There is no evidence to suggest that ▮ initiated the vaginal or penile contact that occurred, thus the responsibility for obtaining consent for that contacted rested with ▮ Further, returning to and remaining in the room with ▮ cannot reasonably be interpreted as consent to sexual contact, especially when ▮ believed ▮ to be asleep at multiple points during the encounter.

▮ stated that ▮ initiated oral-genital contact and also asked her twice if she wanted to have sex with him. ▮ denied engaging in any oral-genital contact and denied asking ▮ if she wanted to have sex. I find the evidence about both of these issues to be inconclusive. Both parties offered some details about the encounter that were not corroborated or were contradicted by other information provided. ▮ recollection about how long the encounter lasted is not corroborated, based on the witnesses' certainty that the group split up between 2:30 and 3:00 a.m. and the ▮ Hall video establishing ▮ departure at 5:00 a.m. ▮ however, told me the encounter lasted about 15 minutes and ended at around 2:30. ▮ account of having a conversation in the bathroom with ▮ after she left ▮ room and before returning to his room was not corroborated by ▮ However, regarding the core accounts about the removal of ▮ pants, the vaginal-digital contact, and the digital-penile contact, the evidence supports the conclusion that ▮ did not consent.

**Conclusion**

Based on the Investigation Report, the audio recordings, the supporting documents and video, and ▮ response to the Report, I find there is sufficient evidence to determine that it is more likely than not that ▮ engaged in sexual assault on November 12, 2017, as defined by St. Olaf's Policy.

Further information regarding the parties' right to appeal this determination will be provided by the College through Kari Hohn, Title IX Case Manager. All further inquiries about this matter should be directed to her.

CC:   Jo Beld, Title IX Coordinator