## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John Doe, | Civil No. 18-cv-02689 (MJD/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS** |
| St. Olaf College, | |
| Defendant. | |

## INTRODUCTION

John Doe acknowledges that while attending St. Olaf College ("the College"), he brought an intoxicated female student, Jane Roe, to his dorm room in the middle of the night. He acknowledges that once Roe was in his room he attempted to fondle her and put her hand on his penis even though he never obtained clear verbal consent. He acknowledges that although Roe fell asleep that did not stop him from engaging in further sexual contact with her. Doe also acknowledges that Roe thereafter made a sexual assault report to the College and the police.

In connection with these events, Doe was charged with four counts of criminal sexual conduct. His state-court case remains pending. When interviewed by the police, Doe admitted that he performed multiple sex acts with Roe while she was both intoxicated and asleep, and that he felt he took advantage of Roe because of her condition. (Norrie Dec. Exs. A, B.) Doe has filed a pre-trial motion in state court to suppress these admissions on constitutional grounds not applicable here.

Consistent with its written policies and procedures, the College hired a third-party neutral to investigate Roe's sexual assault report. Throughout the investigation both parties could introduce evidence, request that the investigator interview certain witnesses, and propose questions to be asked of the other party and witnesses. When the investigation was complete, both parties were provided with the investigator's factual findings. Doe then submitted a written response. After considering Doe's written response, the investigator issued a decision letter concluding that Doe had violated the College's policy prohibiting sexual misconduct. Doe filed a written appeal, which was considered by an Adjudication Panel. Doe was assisted by an attorney throughout the process. The Adjudication Panel upheld the investigator's determination and expelled Doe.

Doe disagrees with that decision and brought this lawsuit to overturn the results of the College's disciplinary process. Despite the College's efforts to ensure both parties had a full and fair opportunity to be heard, Doe requests that the Court "expunge the entire disciplinary proceeding" from the school's file, prohibit the school from referencing the disciplinary proceeding in response to any outside inquiry, and permit Doe to deny that he has ever been accused of sexual misconduct.

This is an invitation the Court should refuse.

Doe's Complaint contains speculative and conclusory allegations that because he disagrees with the College's decision, there *must* have been something unlawful about the process. The Complaint is utterly devoid of any plausible factual allegation that the process or decision was discriminatory or in violation of the common law. The College therefore

2

respectfully requests that the Court dismiss Doe's Complaint for failure to state a claim upon which relief may be granted.

## FACTS [1]

St. Olaf College is a nationally-ranked liberal arts college founded in 1874. Its mission is to challenge students to excel in the liberal arts, examine faith and values, and explore meaningful vocation in an inclusive, globally-engaged community nourished by Lutheran tradition. To advance this mission and its core values of educational excellence, spiritual well-being, community, and wholeness, the College is committed to providing a respectful, safe, and healthy environment for all its students.

### A.     The College's Policy prohibiting misconduct.

The *St. Olaf College Policy Prohibiting Discrimination, Harassment and Related Misconduct* (the "Policy") provides the College's framework for analyzing and responding to complaints of sexual misconduct.[2]

The Policy provides approximately seven pages of definitions of "prohibited conduct" and related terms. (*See* ECF No. 1-1 at § III. A, C.) The Policy explains that "[s]exual assault is any sexual contact with another person who does not or cannot give

---

[1] Although the College strongly disagrees with many of the facts asserted in the Complaint, the Court is required to accept Doe's allegations as true for purposes of this motion only. As such, this motion is based on the allegations in Doe's Complaint, the exhibits attached to his Complaint, and matters of public record. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697–98 n.4 (8th Cir. 2003); *Rasmusson v. Chisago Cty.*, 991 F. Supp. 2d 1065, 1071 (D. Minn. 2014).

[2] A true and correct copy of the policy in effect during the relevant time period is attached to the Complaint as Exhibit 1. (*See* ECF No. 1-1.)

consent." (*Id.* § III.C.3.) This includes, "[r]ape (the penetration, no matter how slight, of the vagina or anus with any body part or object…without the consent of the victim) [and] [f]ondling (the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim.)" (*Id.*) "Consent" is defined in the Policy as: "words or overt actions by a person clearly and affirmatively communicating a freely given, present agreement to engage in a particular form of sexual contact." (*Id.* § III.C.11.)[3]

The Policy also sets forth the process by which complaints against a St. Olaf student will be adjudicated and resolved. (*See id.* § IV–VI.) Under the Policy, students can report incidents of prohibited conduct to any member of the Title IX team. (*Id.* § IV.A.3.) When a report of sexual misconduct is received, the Title IX Coordinator contacts the reporting party. (*Id.* § V.A.3.) The reporting party may then choose to participate in either an informal or formal resolution process or decline to pursue resolution altogether. (*Id.* § V.A.1, 2.) Here, Jane Roe chose to participate in a formal resolution process.

Under the formal review process, a third-party neutral conducts an investigation, issues an Investigation Report to which the parties may respond in writing, and issues an Investigation Decision Letter based on the evidence obtained throughout the investigation. (ECF No. 1-1 §§ VI.C.4–13.) The parties are allowed to appeal the Investigator's Decision to an Adjudication Panel. (*Id.* § VI.C.13.) The Adjudication Panel then determines whether

---

[3] The Policy's definitions of "consent," "sexual contact," "mentally incapacitated," and other terms are derived directly from Minn. Stat. § 609.341.

4

to affirm the Investigator's Decision, and, if an adverse decision is affirmed, impose appropriate sanctions. (*Id.* § VI.C.14–16.)

### B.     The sexual assault and Jane Roe's complaint against Doe.

By his own account, on November 12, 2017, Doe was drinking in his dorm room when he invited his female friend and the women she was with (including Jane Roe) to "hang out at his dorm." (ECF 1, Compl. ¶¶ 50–51.) Once alone, Doe and Roe "started to make out on [his] bed." (*Id.* ¶ 69.) As they were "making out," Doe began to remove Roe's shirt and bra. (*Id.* ¶¶ 71–72.) Doe then claims he asked Roe if he could remove her pants and it seemed as though she "made a noise that sounded like assent." (*Id.* ¶ 73–75.) Thereafter, Doe admits to touching Roe's vagina, but states that she "had little response to his touch, so he stopped touching her…." (*Id.* ¶ 77.) While moving to the outside of the bed, Doe claims Roe spoke again, so he started to touch her vagina again. (*Id.* ¶ 78.) Doe then claims that he could "feel [Roe's] hand near his crotch and thought she was reaching for his penis, so he pulled his shorts down and moved [Roe's] hand to his penis." (*Id.* ¶ 79.) Doe then looked at Roe's face, and "believed that she had fallen asleep." (*Id.* ¶ 80.) After sleeping for "some time" Doe woke Roe to let her know he was leaving to go to the bathroom. (*Id.* ¶¶ 80–81.) He admits that Roe seemed confused about where she was and asked why she was not wearing clothes. (*Id.* ¶ 82.) When Doe returned, Roe was leaving, and said she never wanted to see him again. (*Id.* ¶ 84.)

On November 15, 2017, Doe was interviewed in his dorm room by officers from the Northfield Police Department. (*Id.* ¶ 91; *see also* Norrie Ex. B.) Roe also contacted College officials to report a sexual assault. (Compl. ¶ 92.)

### C.     The investigation.

Consistent with the Policy, on November 17, 2017, two days after Roe contacted College officials to make a complaint of sexual assault, the College sent Doe a letter informing him of the claims that had been made by Roe and how the matter would proceed. (ECF No. 1-1 § VI.C.3–4; ECF No. 1-3.)

An investigation then began, which was led by third-party investigator Mary Dunnewold. (*Id.*; ECF No. 1-8 at 2.) Both parties were given an opportunity to submit evidence, name witnesses to be interviewed, and propose questions to be asked of the other party and witnesses. (ECF No. 1-1 § VI.C.2.) During the 18-day investigation, Dunnewold interviewed[4] eight students including Roe and Doe, and reviewed text messages and videos from the residence halls. (ECF No. 1, Compl. ¶¶ 99, 108.) Doe chose legal counsel to act as his advisor to aid him in this process.[5] (ECF No. 1-4 at 2–3.)

During his interview with Dunnewold, Doe admitted that when he told Roe he was going to remove her pants, she said something in response that he did not understand, so he shook her a little and asked a couple more times. (ECF No. 1-7 at 1, 5.) He reported that she did not give an audible response to his inquiry. (*Id.* at 5.) He then proceeded to pull down her pants. (*Id.* at 6.) Doe told Dunnewold that he believed Roe consented to vaginal-digital contact because, even though she did not respond much when he first touched her

---

[4] Per the College's process, Dunnewold audio-recorded each of these interviews.

[5] Doe admits that St. Olaf's Title IX Case Manager advised him to obtain legal counsel to aid him in these proceedings. (*See* ECF No. 1-4 at 1) ("It was you [Kari Hohn] who suggested I hire an attorney as my advisor . . . .").

and believed she was asleep, he thought she woke up. (*Id.* at 6.) When she again did not respond "as he expected" he tried to wake her up again. (*Id.*) Finally, Doe admitted that Roe "mutter[ed]" in response or responded in a way that he could not understand, but still he proceeded with sexual contact. (*Id.*) For example, Doe admitted that even though Roe's arm was limp, and he believed she was passed out, he still proceeded to put her hand on his penis. (*Id.*)

On December 4, 2017, Doe received an email informing him that the close of evidence in the investigation was scheduled for December 5, 2017 at 5:00 p.m. (Compl. ¶ 103.) Four days later, on December 8, 2017, the College notified Doe that Dunnewold had completed the investigation phase of the process and prepared an Investigation Report. (ECF No. 1-4 at 4.) Doe and his attorney were able to review the Investigation Report and evidence gathered, meet with Dunnewold again, and submit additional comments. (ECF No. 1-4 at 4.)

Pursuant to the Policy, the parties had five days to submit a response to the Investigation Report; however, the College granted Doe's request for additional time to prepare his response. (*Id.* at 3.) Doe also requested that he be allowed to switch advisors from his lawyer to his father for "economic reasons." (*Id.* at 1) (email from Doe stating "I do not believe it economically sound for me to be paying an attorney to be my advisor for the entire length of time it may take for me to review the investigation materials.") The College agreed to this request as well, but also advised Doe that his father would need to act as his advisor for the remainder of the proceedings as the College was legally required

under the Family Educational Rights and Privacy Act to limit the dissemination of other students' information. (*Id.* at 1–2.)

Two weeks after the close of evidence, Doe sent an email asking that additional information be obtained by Dunnewold, including:  statements to the Northfield Police, results of Jane Roe's forensic exam, all videos from the residence hall (not only those from the entrances and exits), access to training videos Roe may have seen regarding sexual assault, a list of accommodations provided to Roe in connection with this matter, and a list of all information received by the College prior to the request for a formal investigation. (Compl. ¶ 109.) Doe also provided a list of questions he wanted Dunnewold to ask Roe. (*Id.* ¶ 110; ECF No. 1-6.) Under the Policy, Dunnewold had the discretion to determine whether further investigation was warranted. (ECF No. 1-1 § VI.C.10.) She did not re-open the investigation based on the alleged missing evidence cited by Doe. (ECF No. 1-7.)

### D.    The Investigation Decision Letter.

On December 20, 2017, Dunnewold issued an Investigation Decision Letter concluding that Doe violated the Policy prohibiting sexual assault. (Compl. ¶ 111; ECF No. 1-7 at 1, 4.) Dunnewold determined that "[Roe] did not consent to the removal of her pants and underwear, did not consent to having her hand placed on [Doe's] penis, and did not consent to vaginal-digital contact by [Doe]." (*Id.*) She further "found that [Roe's] statement that she was shut down, lying still, and not responding or reciprocating the activity, and thus not affirmatively communicating consent, is credible, considering [Doe's] own statements that he had to shake her to elicit a response from her and that he several times stopped what he was doing to try to awaken her because she was not

8

responding." (*Id.*) Finally, Dunnewold noted that after the encounter, both parties acted in a manner consistent with a lack of consent. Roe states that she left the room in a hurry, and did not stop to tie her shoes, which was corroborated by the video from the residence hall entrance. She also texted her friend M at 5:10 a.m., which she sent while walking from Doe's dorm, stating that something "bad happened." (*Id.* at 7.)

### E.     The appeal and adjudication of sanctions.

After he received the Investigation Decision Letter, the College advised Doe of his right to appeal. (Compl. ¶ 111.) Doe requested—and was granted—additional time to appeal Dunnewold's decision. (*Id.* ¶ 118.) Doe's appeal argued that Dunnewold ignored important evidence that Doe had requested be gathered and failed to ask Roe certain questions during the investigation. (*See* ECF No. 1-8 at 2–3.) Consistent with the Policy, all investigation materials, including the parties' written responses and Doe's appeal letter, were submitted to the Adjudication Panel. (ECF 1-1 § VI.C.13.)

On January 12, 2018, Doe was provided with the Panel's Determination of Appeal and Sanctions. (Compl. ¶ 119; ECF No. 1-8.) In great detail, the Panel explained the reasons it was denying Doe's appeal. The Panel noted that Doe had failed to request that Dunnewold consider any of this evidence until after the close of evidence deadline. (*See* ECF No. 1-8.) Further, Doe was able to identify only *one* witness who was not interviewed by Dunnewold. (*Id.* at 3.) This student failed to appear for a scheduled interview, and Dunnewold determined that this witness's statement would have been duplicative since he was proffered to describe a conversation that Doe and another witness had already described. (*Id.*) Because this evidence had no bearing on the events that occurred while the

9

parties were in Doe's room, the Panel determined that Dunnewold did not err in excluding it. (*Id.*) Similarly, the Panel concluded that Dunnewold did not err in refusing to re-open the investigation to ask Roe questions provided by Doe. (*Id.*) The list of questions was submitted two weeks after the deadline expired for introducing new evidence, and in fact, many of the questions were asked during the investigation (although in a different manner). (*Id.*) Ultimately, the Panel affirmed the Investigator's Decision Letter, and expelled Doe from St. Olaf College. (*Id.*)

F.   **Doe's allegations against the College.**

As the Complaint and exhibits make clear, the College complied with each step of its Policy regarding the investigation of sexual misconduct:

- The College notified Doe of the complaint against him and the process that would be followed to investigate Roe's claims. (Compl. ¶ 96.)

- An investigation was conducted by Dunnewold, in which she interviewed eight witnesses, including Roe and Doe, and collected documentary evidence. (Compl. ¶¶ 99, 108.)

- Doe was provided prior notice of the approaching "close of evidence" and encouraged to submit any evidence he wanted Dunnewold to consider prior to this deadline. (Compl. ¶ 103.)

- Dunnewold drafted an Investigation Report and allowed time for Doe to review the report and underlying evidence. (Compl. ¶ 104.)

- The College notified Doe of his right to file a written response to the Investigation Report, which he submitted on December 18, 2017. (Compl. ¶¶ 104, 109.)

- Doe was given a copy of the Investigator's Decision Letter. (Compl. ¶ 113).

- Doe was advised of his right to file an appeal to the Investigator's Decision Letter, which he submitted on January 2, 2018. (Compl. ¶ 118.)

10

- The Adjudication Panel reviewed Doe's appeal and affirmed the Investigator's Decision after reviewing the investigation materials and evidence. (Compl. ¶ 119.)

- The Adjudication Panel provided Doe with its Notice of Sanction, expelling Doe from the College. (Compl. ¶ 119.)

Doe's Complaint nevertheless claims that the College's process—from investigation to appeal—was flawed and unfair. At its core, the Complaint argues that the College ultimately reached the wrong conclusion and imposed an unfair sanction. (Compl. ¶¶ 129–160.) Doe also summarily alleges that the College's conclusions were the result of gender and racial bias. (*Id.*)

## LEGAL STANDARD

In considering a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Uhr v. Responsible Hosp. Inst., Inc.,* 2011 WL 4091866, at *6 (D. Minn. Sept. 14, 2011) (citing *Blankenship v. USA Truck, Inc*., 601 F.3d 852, 853 (8th Cir. 2010)). But the plaintiff must do more than offer "labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, the "factual allegations must be enough to raise a right to relief above the speculative level…" *Id*.

To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not

pass muster under *Twombly*." *Doe v. St. John's Univ.*, 2017 WL 4863066 at *3 (D. Minn. Oct. 26, 2017).

## ARGUMENT

## I. COUNTS I AND II OF THE COMPLAINT (TITLE IX) SHOULD BE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CLAIM.

Title IX prohibits colleges and universities from engaging in sex-based discrimination. In particular, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

Federal agencies have been vested with congressional authority to promulgate "rules, regulations, and orders" to enforce the objectives of Title IX, and are empowered to "give effect to the statute's restrictions." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638-39 (1999). The U.S. Department of Education has enacted regulations requiring schools subject to Title IX to "adopt and publish grievance procedures for providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited" by the statute, including allegations of sexual misconduct made by students. 34 C.F.R. § 106.8(b).

Here, Doe claims that the College's enforcement of its Policy amounts to sex-based discrimination. But to establish such a claim, Doe must show that the College discriminated against him on the basis of sex, that the discrimination was intentional, and that the discrimination was a "substantial" or "motivating" factor for the College's actions. *See*

12

*Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001). "[And] [a]s a general rule, Title IX is not an invitation for courts to second-guess disciplinary decision of colleges or universities." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017).

### A.   Doe's claim for declaratory relief fails because there is no private right of action to enforce the regulatory requirements of Title IX.

Count I of Doe's Complaint seeks a declaratory judgment that the College violated Title IX's regulatory requirement that schools adopt and publish a prompt and equitable grievance procedure. But numerous courts considering this issue—including the District of Minnesota—have recognized that Title IX does not include a private right of action to enforce the regulatory requirements of the statute. Thus, Doe's claim should be dismissed as a matter of law.

To obtain a declaratory judgment, a plaintiff must first have a private cause of action. The Declaratory Judgment Act does not confer a substantive right absent an underlying statutory cause of action. *See, e.g.*, *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he Declaratory Judgment Act is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right."). Thus, for Doe to have a valid claim for declaratory relief based on the College's alleged violation of the regulatory requirements of Title IX, the statute must first afford him a private right of action to enforce those procedural requirements.

In *Gebster v. Lago Vista Independent School District*, the Supreme Court recognized the limits of a claim under Title IX, noting that it had never extended a private right of action for damages allegedly due to a violation of Title IX's administrative

requirements. 524 U.S. 274, 292 (1998). Similarly, the Supreme Court recognized that the failure of a school to "promulgate a grievance procedure does not itself constitute discrimination in violation of Title IX." *Id.* at 277. Instead, the "prompt and equitable grievance procedure" requirement of Title IX may be enforced *administratively* by the U.S. Department of Education, but not by way of a private cause of action. *Id.*

In reliance on this authority, as well as the holdings of many other courts, the District of Minnesota has repeatedly held that there is no private right of action to enforce grievance procedures and other regulations under Title IX. *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017); *Doe v. St. John's Univ.*, 2017 WL 4863066 at *3 (D. Minn. Oct. 26, 2017). Lacking a private right of action, Doe's claim for declaratory judgment fails as a matter of law and must be dismissed.

**B.    Doe's Complaint fails to state an "erroneous-outcome" claim under Title IX.**

Doe's claim for relief based on an erroneous-outcome theory fares no better. "A plaintiff may assert a claim under Title IX based upon an erroneous-outcome theory, in which the plaintiff attacks the university disciplinary proceeding on grounds of gender bias by arguing that the plaintiff was innocent and wrongly found to have committed an offense." *Salau v. Denton*, 139 F. Supp. 3d 988, 998 (W.D. Mo. 2015). To allege a claim that a disciplinary proceeding reached an erroneous outcome because of sex discrimination, a plaintiff must plausibly plead facts that (1) cast articulable doubt on the outcome of the

proceeding and (2) allege a causal connection between the flawed outcome and gender bias.[6] *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

> [A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.

*Id.* Allegations of causation sufficient to state a Title IX claim can include statements by members of the disciplinary tribunal, statements by pertinent university officials, or specific patterns of decision-making that tend to show the influence of gender. *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015).

Courts around the country have consistently adhered to these requirements and have dismissed Title IX claims that rely solely on generalized allegations of a procedurally flawed proceeding and conclusory statements of gender bias. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 2018 WL 1521631 (S.D. Ohio Mar. 28, 2018); *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289 (D.N.M. 2017); *Doe v. St. John's Univ.*, 2017 WL 4863066 at *3 (D. Minn. Oct. 26, 2017); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017); *Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017); *Doe v. Cummins*, 662 F. App'x 437, 439 (6th Cir. 2016) (affirming the district court's dismissal of a Title IX claim when

---

[6] Given Doe's admission of misconduct to law enforcement as contained within the public criminal court records, Doe cannot cast any real doubt about the outcome of the College's process, and the Court may dismiss the Title IX claim without further analysis.

the complaint "failed to create a reasonable inference that gender bias affected the outcome of their respective proceedings"); *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1227 (D. Or. 2016)*; Doe v. Univ. of Mass. - Amherst*, 2015 WL 4306521 (D. Mass. July 14, 2015) (dismissing the plaintiff's Title IX claims when the allegations "may . . . accurately reflect that the University treated Jane Doe more favorably than [p]laintiff during the disciplinary process, but . . . are insufficient to suggest that the disparate treatment was because of [p]laintiff's sex"). These authorities make clear that more is required to plead a Title IX claim under an erroneous-outcome theory than generalized assertions—specific facts must be pleaded to support a plaintiff's discrimination claim.

Here, Doe's allegations are wholly insufficient to plead a valid claim of discrimination under Title IX. Notably, Doe does not allege "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *See Sahm*, 110 F. Supp. 3d at 778.

Instead, Doe's allegations of gender discrimination consist of the following generalizations:  (1) because of federal pronouncements and policies, the College faces pressure "to treat male students accused of sexual misconduct with a presumption of guilt and to simply punish the male students" accused of misconduct to avoid loss of federal funds; (2) College officials involved in the disciplinary process are only "thinking what would be most expedient for them in their professional roles" and the very existence of the Policy is evidence that College officials are susceptible to pressures to change "campus rape culture;" (3) College officials are motivated to avoid negative publicity associated

16

with finding male students not responsible for Policy violations; (4) "in all, or in virtually all, cases of campus sexual misconduct" the accused student is male and the accusing student is female and the College "has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX"; and (5) the College "colluded" with the police to "entrap" and "elicit statements" from Doe. But these allegations are insufficient to state a plausible claim that any alleged erroneous outcome occurred specifically because of Doe's sex. *See Doe*, 2017 WL 4863066 (concluding that the plaintiff failed to state a valid claim for relief in a case involving many of the same allegations).

      **1.    Doe's claim that alleged federal pressure caused the College to treat him with a "presumption of guilt" does not give rise to a plausible claim of sex discrimination under Title IX.**

First, Doe claims that the College discriminated against him because of his sex due to presumed and alleged pressure from the federal government regarding the prevention of sexual misconduct on college and university campuses. But, even if taken as true for purposes of this motion, this allegation is, at best, consistent with bias in favor of sexual assault victims, and is hardly evidence of sex discrimination. In fact, courts have routinely held that this type of allegation is insufficient to allege sex discrimination, and that a bias in favor of sexual assault victims cannot give rise to a plausible inference of sex discrimination. *See Doe*, 662 F. App'x at 452; *Sahm*, 110 F. Supp. 3d at 778 (recognizing that such allegations "do not suggest a gender bias against males so much as against students accused of sexual assault"). And the District of Minnesota recently "join[e]d the majority of federal courts in finding that a general reference to federal pressure, by itself,

is insufficient to show gender bias." *Doe*, 2017 WL 4863066 at *13 (D. Minn. Oct. 26, 2017.) Thus, these allegations are insufficient to give rise to a claim of sex discrimination under Title IX.

### 2.      Doe's claim that College officials think only about their own interests is plainly insufficient as a matter of law.

Doe's Complaint contains an allegation that College officials are motivated only by their own self-interest. To be sure, this unsupported and unexplained allegation appears to be made from whole cloth. More importantly, nothing in the Complaint ties this allegation to gender discrimination. In that way, it seems tied to Doe's overall theory that the *only* explanation for the conduct of the investigation and adjudication of the sexual-misconduct complaint is gender bias. But again, Doe's complaint fails to make specific factual allegations demonstrating why or how this is the only explanation for the so-called erroneous outcome. Instead, Doe is content to allege that the outcome itself is demonstrative of sex discrimination. Courts have routinely dismissed Title IX claims based on similar allegations, concluding that the allegations are insufficient under Rule 12 to state a valid claim for relief. *See Doe v. Case W. Res. Univ.*, 2015 U.S. Dist. LEXIS 123680, at *13-14 (N.D. Ohio Sep. 16, 2015) ("While these pleadings may call to question the outcome of the proceedings, they are not factual allegations supporting the conclusion that the procedural flaws and hostility towards [p]laintiff were motivated by sexual bias."). The same is true here—Doe's allegations are too conclusory and generalized to support a claim for relief under Title IX.

### 3. Doe's claim that the College seeks to avoid negative publicity does not support a claim for gender discrimination.

Doe also alleges that it is "safer" for College officials "to convict all accused male students rather than face the negative publicity associated with decisions" in which male students are found not to have violated College policy. In support of this theory, Doe makes a perfunctory reference to a separate incident that occurred at the College three years ago. But this passing reference is insufficient to support a Title IX claim for at least four reasons. First, Doe gives no explanation about how or why any such pressure on the College could impact the neutral, third-party investigator who makes all findings of fact under the Policy. Second, Doe does not explain how the previous incident continues to impact the College given the passage of time. Third, Doe does not acknowledge the possible existence of negative publicity associated with the College's course of action in his own case.

Finally, Doe's allegations do not show that any pressure was focused on *his own disciplinary proceeding*, as opposed to the College's handling of sexual assault on campus more generally. In the cases where public pressure has been found to support claims of erroneous outcome, that public pressure targeted the specific disciplinary action being challenged by the plaintiff. *See, e.g., Doe v. Amherst Coll.*, 2017 WL 776410, at *17 (D. Mass. Feb. 28, 2017) (allegations support claim of erroneous outcome where student who filed complaint accusing plaintiff of sexual misconduct was involved in student-led movement to compel the college to change the way it handled sexual assault allegations; the college was aware of her involvement in the movement; and the college was actively trying to appease the student-led movement); *Doe v. Lynn Univ., Inc.*, 2017 WL 237631,

19

at *4 (S.D. Fla. Jan. 19, 2017) (allegations support claim of erroneous outcome where news media report criticized the university for its handling of sexual assault complaints made by female students against males; media report generated pressure from parents of female students and the public; and the university was cognizant of that criticism).

Absent such allegations here, the Court cannot find that Doe has established a particularized causal connection between the flawed outcome and gender bias. *See Doe v. Univ. of Cincinnati*, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018).

### 4.    The overall gender composition of complainants and respondents does not support a claim for gender discrimination.

Doe alleges that in nearly all cases of sexual misconduct, the accused student is a male and the accusing student is a female, and that the College impermissibly presumes the male student is "guilty until proven innocent." Doe further alleges that victims are not required to have corroborating evidence in these investigations. But again, even if these allegations are true, they are insufficient to give rise to a plausible inference that gender bias was a motivating factor in the College's adjudication of this misconduct complaint.

Courts again have roundly rejected these types of conclusory statements in Title IX cases. *See, e.g.*, *Doe*, 2015 WL 4306521, at *9 ("Though he asserts that 'male respondents in sexual misconduct cases at [the University] are discriminated against solely on the basis of sex' and are 'invariably found guilty, regardless of the evidence, or lack thereof[,]' these statements are unsupported by even minimal data or credible anecdotal references; they are the type of conclusory statements that *Iqbal* and *Twombly* do not allow the court to consider."); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 608 (S.D. Ohio 2016)

("Plaintiffs in this case makes the same allegation - males charged with sexual misconduct invariably are found responsible for the violation. The Court, however, concludes that this bare allegation is insufficient to plausibly infer that the results of [p]laintiffs' disciplinary hearings were affected by gender discrimination."). Again, a conclusory allegation that males are treated differently than females in these types of investigations, without any facts to support that assertion, is insufficient to state a valid claim. *See Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (noting that most courts to consider the issue have found that "pro-victim bias . . . does not equate to anti-male bias").

In *Doe v. University of Cincinnati*, the district court further explained that disparate-impact claims are not permitted under Title IX, and that therefore, allegations that otherwise gender-neutral disciplinary procedures "disproportionately affect men" did not state a valid claim for relief. 173 F. Supp. 3d at 608. Thus, Doe's attempt to bootstrap a disparate-impact theory into his sex-discrimination claim cannot be permitted.

Not only are Doe's allegations insufficient to support a Title IX claim, but a statistical disparity in the number of sex offenses committed by males and females provides a more than plausible non-discriminatory reason for the alleged disparity among sexual-assault reporting. *See id.* at 607-08 ("There are, however, at least two related non-discriminatory reasons for the disparity between males and females in sexual misconduct disciplinary cases:  1) UC has only received complaints of male-on-female sexual assault; and 2) males are less likely than females to report sexual assaults."). Absent specific facts or allegations to account for these non-discriminatory bases for the difference in reporting,

Doe's bald assertion that it is "impossible" for an accused male student to receive due process is simply insufficient.

> ### 5.   Bald allegations of police misconduct do not support a claim for gender discrimination.

Finally, Doe alleges that the College "colluded" with law enforcement agents who used inappropriate interview techniques. But nothing in the Complaint explains how any such conduct, even if true, is evidence of gender bias against males. Such a conclusory statement is insufficient to plausibly allege the required causal connection to sex discrimination. Dismissal is therefore appropriate. *See Doe v. St. John's Univ.*, 2017 WL 4863066 at *3 (D. Minn. Oct. 26, 2017.)

In sum, Doe's Title IX claim based on an erroneous-outcome theory fails to state a valid claim upon which this Court may grant him relief. His allegations fall far short of what is required to state a claim of sex discrimination, as evidenced by the recent decisions out of this District that considered identical claims based on similar allegations. Doe's claim amounts to nothing more than dissatisfaction with the result of the sexual-misconduct investigation and adjudication – but that of course is not evidence of sex discrimination. Accordingly, the College respectfully asks this Court to grant its motion to dismiss Doe's Title IX claims.

## II.   DOE'S NEGLIGENCE CLAIM SHOULD BE DISMISSED BECAUSE HE FAILED TO PLEAD A VALID LEGAL DUTY.

A negligence claim requires proof of four elements:  (1) the existence of a duty of care; (2) a breach of that duty; (3) proximate cause; and (4) damages. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581-82 (Minn. 2012). Duty is a threshold question

22

"[b]ecause a defendant cannot breach a nonexistent duty." *Id.* And given the fundamental differences between tort and contract actions, a contract cannot establish duty for purposes of a negligence claim. *Id.* at 584; *D & A Dev. Co. v. Butler*, 357 N.W.2d 156, 158 (Minn. Ct. App. 1984) "When a contract provides the only source of duties between the parties, Minnesota law does not permit the breach of those duties to support a cause of action in negligence." *United States v. Johnson*, 853 F.2d 619, 622 (8th Cir.1988) (citing *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983)).

Doe's claim for negligence is based solely on the College's alleged failure to follow its Policy Prohibiting Discrimination, Harassment and Related Misconduct. (Doc. 1 at ¶ 147.) More specifically, Doe asserts that the College breached its duty of care "to conduct [the student disciplinary process] in a non-negligent manner and with due care." (*Id.*) Thus, the origin of the College's alleged duty, which forms the basis of Doe's claim, is not "imposed by law" and therefore does not support a negligence claim. *See D & A Dev. Co.*, 357 N.W.2d at 158.

In essence, Doe claims that the College failed to perform policy-based obligations in a non-negligent manner. But Doe cannot simply recast alleged contract-like obligations as a duty of care for purposes of asserting a negligence claim. *See Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (S.D.N.Y. 2014) ("Simply alleging a duty of care does not transform a breach of contract into a tort claim."). Because Minnesota recognizes no claim for negligent breach of contract, and because Doe's negligence claim is premised solely on alleged policy-based obligations, the claim fails as a matter of law.

Even if Doe could establish a duty based on the Policy, his Complaint fails to state a valid claim for relief because it does not include any factual allegations that the College breached the Policy. Instead, the Complaint includes only conclusory statements that the College "fail[ed] to implement the policy in a manner that would result in a fair process, tilted to favor a particular outcome by not having a fair and neutral fact finder." (Compl. ¶ 148.) Such labels and conclusions are insufficient to state a claim for relief that is plausible on its face, and the negligence claim should therefore be dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).

## III.  THE COMPLAINT FAILS TO STATE A VALID CLAIM OF RACE-BASED DISCRIMINATION.

With absolutely no factual support, Doe alleges that the College also discriminated against him based on his race in violation of Title VI and the Minnesota Human Rights Act (MHRA). (Compl. ¶¶ 150–160.) Throughout his 42-page Complaint, Doe makes (at most) *four* race-related factual allegations:

1.   John Doe is a student of South Asian origin. (Compl. ¶ 2.)

2.   Doe was subjected to harassment, discrimination, and disparate treatment when he was removed from St. Olaf based on allegations that did not result in the removal of similarly situated Caucasian students. (Compl. ¶ 152.)

3.   St. Olaf, despite knowledge and adequate opportunity to learn of its misconduct failed to take action to remedy the harassment, discrimination, and disparate treatment of Doe. (Compl. ¶ 154.)

4.   St. Olaf failed to take adequate steps to provide Doe with an educational atmosphere free of racial discrimination. (Compl. ¶ 159.)

This is exactly the kind of "guess now, discover later" pleading the Supreme Court rejected in *Twombly* and *Iqbal*.

A.    **Title VI and the MHRA.**

Title VI provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. "To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct." *Thompson v. Board of Special Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 581 (D. Minn. 1998). Title VI prohibits only intentional discrimination; proof of disparate impact is insufficient. *Alexander v. Sandoval,* 532 U.S. 275, 280 (2001). Further, a plaintiff alleging race discrimination must identify a "comparator"—a person not a member of the same allegedly protected class—who was treated more favorably than the plaintiff. *Mumid v. Abraham Lincoln High Sch.*, 618 F. 3d 789, 794 (8th Cir. 2010). "A conclusory allegation of discrimination without supporting 'facts showing that similarly situated [individuals] were treated differently' cannot support a claim." *Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 980–81 (D. Minn. 2018) (quoting *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (Title VII)).

Similarly, the MHRA provides, in relevant part: "It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, [or] national origin ...." Minn. Stat. § 363A.13, subd. 1. Courts agree that "[t]he MHRA is typically construed in accordance with federal precedent concerning

analogous federal statutes." *Mumid v. Abraham Lincoln High Sch.*, 618 F. 3d 789, 794 (8th Cir. 2010); *Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 980 (D. Minn. 2018). As a result, courts generally consider the claims together. *Mumid*, 618 F.3d at 793; *Brantley v. Indep. Sch. Dist. No. 625, St. Paul Pub. Sch.*, 936 F. Supp. 649, 657 (D. Minn. 1996) ("the [c]ourt will apply the same analysis to [p]laintiff's MHRA claim as it applies to the claim based on the federal statutes—in this instance, Title VI.").

### B. Doe has Failed to Meet the Pleading Standards for Both his Title VI and MHRA Claims.

The law is clear: a cause of action under Title VI exists only if there is proof of *intentional* discrimination. *Alexander,* 532 U.S. at 280. Here, Doe's race-discrimination claims must be dismissed because he has failed to allege any facts that the decision to expel him was based on racial animus. *See Horde*, 2018 WL 987683, at *10. Doe only speculates that because he is South-Asian he was treated differently than white students. He does not allege that he was subject to a different disciplinary process than white students. He does not claim there were any racially-charged statements made to him during the disciplinary proceedings. Nor does he allege that the investigator or members of the Adjudication Panel engaged in racist conduct or based their decision of illegitimate criteria. Instead, Doe speculates that the College's motive is to "overcompensate now, in order to avoid bad publicity" from a previous sexual assault that occurred on campus. (Compl. ¶ 14.) But this allegation relates to *gender* discrimination, not *race* discrimination.

Further, Doe has failed to identify any comparator or similarly situated individual who was treated more favorably than he was. In fact, he fails to allege anything related to

comparators at all. His Complaint should be dismissed on this basis as well. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (plaintiff's conclusory allegation that he "was treated differently as a result of his race than whites"—even where plaintiff identified an alleged comparator—was insufficient to sustain a Title VII (employment discrimination) claim because no factual allegations plausibly suggested the comparator was similarly situated).

*Doe v. The Trustees of the University of Pennsylvania*, 270 F. Supp. 3d 799, 830 (E.D. Pa. 2017), provides helpful guidance. In that case a student accused of sexual misconduct challenged the University of Pennsylvania's disciplinary proceedings. That plaintiff, like Doe here, also brought race-discrimination claims, alleging that his discipline was more severe than comparable cases in which the offenders were white men. *Id.* at 830. He alleged that the school "applied different standards to Jane, a white female, and [plaintiff], an African American male … and assumed that a young African American male in a sexual encounter with a white female must have been the aggressor." *Id.* Finally, he alleged that one hearing panel member was biased because he had published an article stating "that 10% of African American male college students report that they have perpetrated rape (as compared to 4% of white males)." *Id.* The court dismissed the plaintiff's Title VI race-discrimination claim, finding that the complaint alleged no facts that the plaintiff had been treated differently in the disciplinary proceedings due to his race. *Id.*

If the allegations in *Doe v. The Trustees of the University of Pennsylvania* are insufficient, Doe's conclusory allegations surely do not pass muster and his Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, Doe's claims against St. Olaf College should be dismissed with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

BASSFORD REMELE
*A Professional Association*

Dated:  November 20, 2018

By: *s/ Jonathan P. Norrie*
Jonathan P. Norrie (MN #347309)
Brittany Bachman Skemp (MN #395227)
100 South 5th Street, Suite 1500
Minneapolis, Minnesota 55402-1254
Telephone: (612) 333-3000
Facsimile: (612) 333-8829
Email: jnorrie@bassford.com
    bskemp@bassford.com

*Attorneys for St. Olaf College*

4811-6293-6960, v. 1

28